589 A.2d 105

**The TWELVE KNOTTS LIMITED PARTNERSHIP**

v.

**FIREMAN'S FUND INSURANCE COMPANY, et al.**

**No. 724, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 2, 1991.

Ira C. Cooke (Edward J. Birrane, Jr., Joseph F. Zauner, III and Birrane, Harlan & Cooke, on the brief), Baltimore, for Twelve Knotts Ltd. Partnership.

Stanley L. Lipshultz (Victor I. Weiner and Lipshultz and Hone, Chartered, on the brief), Silver Spring, for appellees, Commercial Lines Corp. and Joseph J. Muehleisen.

Richard R. Page Wyrough (Farrington, Smallwood & Wells, on the brief), Landover, for appellees, Fireman's Fund Ins. Co. and American Ins. Co.

Argued before WILNER, C.J., and ALPERT and DAVIS, JJ.

WILNER, Chief Judge.

In a six-count Fourth Amended Complaint filed in the Circuit Court for Baltimore City, appellant sued two insurance companies (Fireman's Fund Insurance Companies and The American Insurance Company), a corporate insurance broker (Commercial Lines Corporation), and an officer of the broker (Joseph Muehleisen). The gravamen of the complaint is that the defendants, directly or vicariously through their agents, represented that they would deliver to appellant a three-year policy of property and liability insurance at an annual premium payable in periodic installments

but guaranteed not to increase during the three-year period, that appellant procured the insurance from or through the defendants in reliance on that guarantee, that the policy actually delivered did not have the promised three-year premium protection, that the defendants knew that the policy lacked the guarantee but failed to disclose that to appellant, and that appellant suffered economic damage when the insurer was permitted to increase the premium after the end of the first year.

The complaint alleged breach of contract (Count I), fraud (Count II), negligent misrepresentation (Count III), breach of fiduciary duty (Count IV), negligence (Count V), and, as to the two insurance companies, failure to use accepted actuarial standards in rerating the policy in violation of Md.Ann.Code art. 48A, § 234A(a) (Count VI). Some of the claims embodied in these counts were disposed of adversely to appellant through pre-trial orders. The case proceeded to trial before a jury on Counts I, II, III, and V, but, at the end of appellant's case, the court granted judgment to the defendants on all of those counts as well.[1] In this appeal, appellant urges that it produced sufficient evidence to withstand the motion as to Counts II, III, and V, and that part of Count I beyond the amount consented to by American Insurance Co. We shall affirm.

## FACTUAL BACKGROUND

Appellant is a limited partnership composed of the 12 children of Henry J. Knott, each of whom apparently held interests in various pieces of real estate. The partnership was formed as a real estate holding company in order to consolidate the management of the real estate. Operational control of the company was in the hands of an executive committee, consisting of four of the partners, and an execu-

---

**1.** With the consent of the defendant, the court did grant judgment under Count I against American Insurance Company in the amount of $1,210. That judgment resolved only one aspect of the claim made in Count I. The major part of Count I was resolved adversely to appellant.

tive director, James Ulmer, employed by the partnership. In 1984, as appellant's current fire, general liability, automobile, and workers' compensation insurance policies were due to expire, the executive committee directed Mr. Ulmer to prepare a request for proposal to solicit replacement policies. That request, as approved by the executive committee, stated, among other things, that:

"It is the intention to place all insurance for a period of not less than three (3) years. All policies, where permissible, should be quoted on such a three year basis with the premiums payable on annual installments or as flexible premium payment options as are available."

Attached to the request were specifications stating the kinds and amounts of coverage desired. The request allowed respondents to offer quotations for broader or more limited coverage but required that any such deviations be specially indicated.

A copy of the request was sent by Mr. Ulmer to Mr. Muehleisen, as president of Commercial Lines. On August 16, 1984, Mr. Muehleisen, on behalf of Commercial Lines, submitted a proposal involving policies from several companies. The property coverages, which are all that we are concerned with here, were to be written by Fireman's Fund. In the section entitled "Premium Summary," the annual premium for the property coverages was stated to be $50,-432. Nothing was said in the written proposal about any three-year guarantee of that premium; the proposal did state, however, that the annual premium for the property insurance "may be paid in 12 equal payments without finance charge...."

Four proposals were received in response to appellant's request, which Mr. Ulmer summarized in a document prepared for the executive committee. That document showed the Commercial Lines proposal to be far superior to the other three; not only was the basic coverage on buildings offered by Commercial Lines more than $1,000,000 above that offered by the other companies but the premium was significantly lower. Commercial's aggregate quotation for

property, workers' compensation, and automobile insurance was $57,000 less than the next lowest bid; the premium for property coverage alone was $48,000 less.[2] All four proposals were for a three-year policy, but only the Commercial Lines offering showed that the annual premium rate quoted was good for three years. That notation was put on the document by Mr. Ulmer, but, notwithstanding that no mention was made of it in the written proposal submitted by Commercial Lines, there was evidence that Mr. Muehleisen had communicated that offer to him. A former secretary for Commercial Lines, Donna Sue Ruth, testified that she overheard Mr. Muehleisen tell another officer of the company, a Mr. Bartels, that he had promised Mr. Ulmer a three-year guarantee of the premium and that Mr. Bartels had expressed concern as to his ability to make good on that promise.

The four proposals were considered by the executive committee on August 24, 1984. The minutes of its meeting state, in relevant part:

"Four bids were received. (A copy of the breakdowns is attached as Page Three of these minutes.) Three bids were roughly the same, while the fourth bid [that of Commercial Lines] was approximately 35% less expensive than the next lowest quotation. In addition, this insurer quoted a guaranteed rate for three years. After some discussion, it was resolved to place this insurance through Commercial Lines Corporation, with the insurance provided by Fireman's Fund, P.M.A., and Chubb Group."[3]

---

**2.** There is a bit of discrepancy in how some of the figures were displayed. The actual quoted premium for the property coverage alone was $50,432. The premium offered by Commercial Lines for general liability was $23,500, and the premium for umbrella liability was $7,500. The total of those figures is $81,432. On the spread sheet prepared for the executive committee, Mr. Ulmer listed the $81,432 under the heading "PROPERTY." There is no *actual* discrepancy; it appears that the heading on the spread sheet simply included amounts separately quoted by Commercial Lines.

**3.** The Commercial Lines proposal offered the property insurance through Fireman's Fund. The general liability, automobile, and

One of the members of the executive committee elaborated a bit on what occurred. Patricia Knott Smyth testified:

"We discussed the quality of the insurance company, we discussed the price, and then, of course, we had a three-year guarantee from Mr. Muehleisen's bid that nobody else had offered. We had not solicited the three-year guarantee rate but it was offered. And since it was like icing on the cake, we decided to take it because we know that or knew and still know that insurance rates fluctuate from year to year, and we recognized that this was a soft market, and we thought we should take advantage of it because we didn't know what would happen in the next two years after that."

Commercial Lines was presumably notified immediately that it had won the bid, for, on the same day—August 24, 1984—it issued a binder from Fireman's Fund Insurance Company for the insurance. The binder showed the premium as $50,432, but said nothing, one way or the other, about whether that rate was guaranteed. The binder did state, however, that the insurance bound "is subject to the terms, conditions and limitations of the policy(ies) in current use by the Company." When it actually ordered the permanent policy a month later Commercial Lines did ask for the three-year guarantee. Its letter to Fireman's Fund stated:

"Please Issue Policy Per Attached App. Annual Prem. To Be 50,432 Payable 4210 1st And 11 × 4202. Rate For Bldg + Cts .08, Rents At .044. 3 Yr Rate Guarantee."

This request, with its abbreviations, indicated to the company that the $50,432 premium was (1) to be paid in monthly installments—one installment at $4,210 and eleven at $4,202—and (2) to be guaranteed for the three-year period. The policy, which was issued on October 19, 1984, did not comport with those instructions, however. The policy was

workers' compensation insurance was to be written by P.M.A., and the umbrella coverage was to be obtained from Chubb Group of Insurance Companies.

actually issued by The American Insurance Company, which, according to the policy, is one of the constituent group of stock companies embodied within the Fireman's Fund Insurance Companies. Its inception date was October 1, 1984. The first part of the policy, appearing immediately after the Declarations pages, contains the general policy conditions. Section 9 of that part, captioned "Premium," states, in relevant part:

"If this policy is issued for a period of three years *and premium is not paid in advance,* the premiums due for each annual period of this policy shall be computed in accordance with the Companies [sic] rules, rates, rating plans, premiums and minimum premium in effect (a) on the inception date of each annual period for annualized policies, or (b) on the inception date of the policy for non-annualized policies."

(Emphasis added.) [4]

The policy also had an integration clause. Paragraph 10 of the General Policy Conditions states, in relevant part:

"By acceptance of this policy the Named Insured agrees ... that this policy embodies all agreements existing between himself and the Company or any of its agents relating to the insurance."

Under the first of these provisions, unless appellant paid the full premium for the entire three years in advance, the rate charged for the first year would *not* be guaranteed, and the premiums due for the second and third years would be based on the company's rates in effect at the beginning of those respective years. There was evidence from Ms. Ruth that Mr. Muehleisen noticed the absence of the rate guarantee when the policy was delivered to him. For whatever reason, Muehleisen did not send the policy to

---

**4.** A similar statement, though worded differently, appears in the "Premium" section of the rental value insurance provisions. That section states: "We will compute the premium as called for by our rules, rates and rating plans applying to the coverages provided by this policy. If a premium is due at each anniversary, we will use the rates in effect at the anniversary date."

appellant until December 20—two months later.[5]   In forwarding the policy to appellant, however, he failed to mention that omission.   His covering letter simply noted the enclosed policy and told Mr. Ulmer that if he had any questions he should call.   Mr. Ulmer, for his part, never read the policy or referred it to any of the partners to read. He said that he looked at the cover letter and the initial page and then sent it to be filed.   Appellant paid the first year's premium on a monthly basis pursuant to invoices from Commercial Lines.

At the end of the first policy year, the insurer became disenchanted and attempted to cancel the policy.   That action, of course, was inconsistent with the three-year term of the policy and, upon appellant's complaint, the State Insurance Commissioner directed the insurer to continue the policy.   Relying on the premium provision of the General Policy Conditions, quoted above, the insurer thereupon demanded the then-current rate for the coverage, which was substantially in excess of the $50,432 that appellant thought had been guaranteed.   Unable to persuade the insurer to its point of view, appellant procured the insurance from other companies.   The cost to it for the second and third years, over and above the $50,432 it believed payable under the American Insurance Co. policy, was, we are told, $223,087.   That extra cost formed the principal basis of its various claims against the defendants.

## ALLEGED ERRORS BY TRIAL COURT

In a pre-trial ruling, the court granted a partial summary judgment on Count II, holding that appellant had failed to establish any fraud in the inducement of the policy.   It held

---

5.   Because judgment was entered at the end of the plaintiff's case, the defense was not afforded an opportunity to explain the reasons for the delay.   No explanation appears in the record before us.   At oral argument in this appeal, defense counsel proffered that there was a legitimate reason for the delay—that Muehleisen had noticed a number of other errors or discrepancies in the policy and caused it to be reissued.

open for further adjudication the issue under that Count of whether, as the result of fraudulent conduct on the part of Muehleisen and Commercial Lines, appellant was prevented from obtaining a three-year guaranteed rate by prepaying the full three years premiums at the inception of the policy. The trial judge disposed of that issue and those arising from the other remaining tort-based counts at the end of appellant's case by holding that:

(1) The three-year guarantee was not material and was not relied upon by appellant;

(2) The fact that the policy did not contain that guarantee (unless the full three-year premium was prepaid) was not concealed from appellant; and

(3) With respect to the claim in Count V that Commercial Lines and Muehleisen breached a fiduciary duty to appellant, those defendants were not hired as experts to advise appellant and therefore owed no fiduciary duty to it.

The court also entered judgment on the breach of contract count brought against the insurance companies in part on the same grounds noted with respect to the tort-based counts and also on the ground that the policies in fact provided for a guaranteed rate, subject to a certain condition, that the companies never breached that provision, and that appellant failed to produce any evidence that it would have prepaid the three-year premium had it in fact been aware of the condition.

Appellant challenges all of these holdings and conclusions, contending essentially that it did indeed present sufficient evidence to establish its various claims. Each of those contentions appears to be based, at least in part, on the premise that Commercial Lines and Muehleisen acted as *its* agents in procuring the insurance.

## DISCUSSION

### *Fraud/Misrepresentation*

The precise nature of the fraud and negligent misrepresentation as pled in Counts II and III of the Fourth Amend-

ed Complaint is not well articulated. The pleading asserts only that false representations were made "with regard to the minimum guaranteed duration of the policy and the fixed three year premium" (Count II), or "with regard to the guaranteed term and guaranteed premium payment to be paid ..." (Count III). As fleshed out later, this complaint seemed to have two parts: (1) the initial representation by Commercial Lines, through Muehleisen, that the premium for a Fireman's Fund policy would be guaranteed for all three years without any mention that it would have to be prepaid in advance and indeed with knowledge that the request for proposals indicated that the premiums were to be paid on a periodic basis; and (2) concealment by them that the policy actually issued did not comport with that representation. The focus was on the conduct of Muehleisen; liability on the part of the other defendants was asserted to be vicarious in nature.

As we indicated, the trial court disposed of the first aspect by concluding, as a matter of law, that the representation was not material in the first instance because it was not relied upon and, even if it had been, there was no evidence that appellant would have been willing to prepay the entire three-year premium in any event. The concealment aspect was rejected on the ground that, as the actual policy provision was clearly stated, nothing was concealed from appellant.

We have no doubt that, on the evidence presented, a jury could reasonably have found exactly as the court did on each of these points. But in a jury trial, the court does not act as a fact-finder in ruling on a motion pursuant to Md. Rule 2–519. It must consider the evidence, and all reasonable inferences from the evidence, in a light most favorable to the party against whom the motion is made. Rule 2–519(b); *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 517 A.2d 1122 (1986). In that regard, the minutes of the executive committee meeting and Ms. Smyth's testimony constitute substantial evidence that the availability of the three-year premium guarantee was at least one factor

weighing in favor of the Commercial Lines/Muehleisen proposal. It was especially noted in the minutes, and, although Ms. Smyth characterized it as being like "icing on the cake," she also stated that "we decided to take it because we [knew] that insurance rates fluctuate from year to year, and we recognized that this was a soft market, and we thought we should take advantage of it because we didn't know what would happen in the next two years after that." The provision, offered only by Commercial Lines, thus had some importance to appellant.

The court was apparently not impressed with this evidence, focusing instead on the fact that appellant had not asked for this guarantee and that, even without it, the Commercial Lines proposal was far better than the competing ones. But that is not the point. It appears from Ms. Ruth's testimony that the guarantee was offered by Muehleisen in order to make the Commercial Lines proposal more attractive, and it appears to have had that effect. A jury could have found that this feature *was* material and that appellant relied upon it in awarding the business to Commercial Lines. It is also fairly inferable from Mr. Bartels' written memo ordering the policy that Fireman's Fund was on notice that the premiums were to be paid monthly and that, notwithstanding the monthly payment schedule, the $50,432 annual premium was to be guaranteed for the three-year period. Its knowledge of that aspect may not have been entirely vicarious, but, in significant part, direct.

It is true, as the court noted, that the policy actually contained a provision for a three-year guarantee, but only if the full premium was paid in advance. It was that condition that was inconsistent with the proposal made to appellant by Commercial Lines and indeed with the latter's request to Fireman's Fund.

The mere fact that the policy, as issued, did not conform to the promise made to appellant does not necessarily give rise to an action for either fraud or negligent misrepresentation, however. Had appellant been given

timely notice of the condition, it could have taken some action in light of it: it could have elected to comply with the condition and pay the full three-year premium in advance; it could have complained and attempted to negotiate a different provision; it could have rejected the policy as not conforming to the contractual undertaking. The evidence showed, however, that appellant was never given the opportunity to do the first of those things. The policy was not delivered to appellant until December 20, 1984—more than eleven weeks after the inception date, nearly nine weeks after the actual date of issuance, and presumably after appellant had already made three monthly payments toward the first year's premium. Even if Mr. Ulmer had been more diligent and actually read the policy when he received it, under the terms of § 9 of the general policy conditions there would have been no way at that time for appellant to have complied with the condition to the guarantee. Appellant could still have rejected the policy or attempted to negotiate the condition, but it could not have complied with it.

The question then becomes whether, viewing the facts in this light rather than as conceived by the trial court, appellant made out a case of fraud or negligent misrepresentation.

The elements of these two torts are well-defined. To sustain an action for fraud, the plaintiff must prove five things: (1) that the defendant made a false representation; (2) that the defendant knew the representation was false; (3) that it was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the representation, had a right to do so, and would not have done the thing from which the damage resulted had it not been made; and (5) that the plaintiff suffered damage as a result of the misrepresentation. *James v. Weisheit*, 279 Md. 41, 44, 367 A.2d 482 (1977); *Martens Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982). The tort of negligent misrepresentation also embodies five elements. The first three, as articulated in *Martens Chevrolet, supra*, are that: (1) the

defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; and (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury. The last two elements—justifiable reliance and damage—are similar to what is required for an action for fraud. *Id.* at 337, 439 A.2d 534.

■ The shortcoming in appellant's action for fraud lies in the first three elements of the tort. Although, as noted, there was evidence that Mr. Bartels had expressed some concern over whether Commercial Lines could produce a three-year guarantee, there was no evidence that Muehleisen or Commercial Lines, much less either of the insurance companies, had made a knowingly false representation to appellant for the purpose of defrauding it. Neither Mr. Bartels nor anyone else expressed a clear belief or awareness that the promised feature could *not* be delivered. What the evidence, in a light most favorable to appellant, thus boils down to is that the brokers promised to produce a policy with a three-year premium guarantee but allowing periodic payment of the premium, that, faithful to their promise, they ordered the policy with that feature, that the policy actually issued did not contain it, and that they failed to inform appellant of the omission although they were aware of it. That simply is not fraud.

■ A similar problem dooms the action for negligent misrepresentation. We shall assume, without deciding, that, because Muehleisen and Commercial Lines acted as a broker for appellant (in addition to their role as agent for the insurers), they owed a duty of care to appellant. *See Canatella v. Davis*, 264 Md. 190, 206, 286 A.2d 122 (1972). Still, we have trouble finding a false statement regarding the premium guarantee. The brokers said that they could produce such a policy and actually ordered one. There was no evidence that, when they made that statement, such a policy could not or would not be produced; nor did they

ever represent to appellant, negligently or otherwise, that the policy actually written had the promised feature in it. The sin, as we have said, was one of passive omission—of the insurers not informing the brokers that the feature they ordered was not in the policy and of the brokers failing to give like information to appellant.

It is for these reasons that we find no error in the entry of judgment on Counts II and III.

### Breach of Contract

The breach of contract claim is embodied in Count I. The gravamen of it is that the four defendants "promised to provide a policy of insurance to the plaintiff for a certain stated minimum term and for a certain stated premium," and that they breached that promise "by attempting to cancel the policy and thereafter altering and raising the premium to be paid for said policy above the agreed-upon contractual amount."

As we have indicated, the American Insurance Co. eventually acknowledged liability for the first aspect of this claim by accepting a judgment for the amount expended by appellant in successfully resisting its attempt to cancel the policy. The second aspect goes to the consequence of the insurers' acting pursuant to the policy language and raising the premium for the second year of coverage—an act that caused appellant to replace the insurance at a price considerably higher than the $50,432. Appellant does not complain in this appeal about the judgment entered on the first aspect; its argument goes only to the court's denial of relief as to the second. In this regard, appellant does not contend that the defendants acted inconsistently with the actual policy language; indeed, it is clear that they acted in full accord with the policy provision. The alleged breach is that the policy was not in accord with the contract of purchase— what was delivered was not what was ordered—and thus the enforcement or implementation of the policy provision constituted a breach of the underlying contract of purchase.

In considering this contention, we start with two propositions both clear and undisputed: (1) § 9 of the general policy conditions did not conform with either the proposal made by Commercial Lines and accepted by appellant or the request sent to Fireman's Fund by Commercial Lines, and (2) the non-conformance was apparent from the policy, and, had Mr. Ulmer or any of the partners read the policy conditions, appellant would have been immediately aware of the non-conformance. With respect to the second of these propositions, appellant, relying principally on *Hampton Roads Carriers, Inc. v. Boston Insurance Co.*, 150 F.Supp. 338 (D.Md.1957), urges that it was entitled to rely on Commercial Lines' having properly performed its duty and was not required to read the policy itself to assure that the policy conformed to the underlying contract.

There is indeed a body of cases, including *Hampton Roads Carriers,* to that effect, that an insured has a right to assume that the policy issued was based on the application and the failure of the insured to read the policy does not excuse the insurer. *See,* in general, 12 J. Appleman, *Insurance Law and Practice* § 7155. That is not a universal rule, however, or even a majority one, and it does not appear to have been adopted in Maryland. Indeed, the same court that decided *Hampton Roads Carriers* took a contrary approach, at least in *dicta,* in the more recent case of *Shepard v. Keystone Ins. Co.*, 743 F.Supp. 429 (D.Md. 1990). In *Shepard,* the insured bought a homeowner's policy. The problem was that no one lived in the home and, under the clear policy language, it was therefore not regarded as a "residence" to which the coverage applied. When the house was damaged by fire and the insurer denied coverage, the insured sued, contending that, by accepting premiums with knowledge that the home was unoccupied, the insurer misled him into believing that the property was covered. The Court concluded that:

> "It is the obligation of the insured to read and understand the terms of his insurance policy, unless the policy is so constructed that a reasonable man would not attempt to

read it. . . . If the terms of the policy are inconsistent with his desires, he is required to notify the insurer of the inconsistency and of his refusal to accept the condition."
*Id.* at 432.

Although, to our knowledge, there are no Maryland cases compelling this result, and none were cited by the District Court, it appears to be the general rule. In the same § 7155, Appleman states:

"[W]hen the insured accepts a policy, he accepts all of its stipulations, provided they are legal and not contrary to public policy. Where changes from the application appear in the delivered contract, under a more stringent doctrine the insured has a duty to examine it promptly and notify the company immediately of his refusal to accept it. If such policy is accepted or is retained an unreasonable length of time, the insured is presumed to have ratified any changes therein and to have agreed to all its terms."

*See,* in support of that statement, *Hartford Fire Insurance Company v. Shapiro,* 117 So.2d 348 (Ala.1960); *Western Farm Bureau Mutual Ins. Co. v. Barela,* 441 P.2d 47 (N.M.1968); *State Distributing Corp. v. Travelers Indemnity Co.,* 224 N.C. 370, 30 S.E.2d 377 (1944); *Del Monte v. Travelers Ins. Co.,* 17 N.Y.S.2d 555 (A.D.1940); *Brasington v. King,* 167 Ga.App. 536, 307 S.E.2d 16 (1983), *aff'd,* 252 Ga. 109, 312 S.E.2d 111 (1984); *Foster v. Crum and Forster Insurance Companies,* 36 Ill.App.3d 595, 345 N.E.2d 49 (1976); 1 M. Rhodes, *Couch Cyclopedia of Insurance Law,* sec. 12:11, p. 803 (1984); *compare Martinez v. John Hancock Mutual Life Ins. Co.,* 145 N.J.Super. 301, 367 A.2d 904 (1976), *cert. denied,* 74 N.J. 253, 377 A.2d 660 (1977).

We believe this to be a reasonable rule, and we therefore adopt it. Under that rule, it is clear that the breach of contract action must fail. Appellant is a sophisticated business entity having had previous experience purchasing insurance. The offending policy provision is clear and unambiguous. Mr. Ulmer and the partners had an opportunity

when the policy was delivered to discover the provision and, if they chose, reject the policy on the ground of non-conformance. Unfortunately, they neglected to do so. By receiving the policy and remaining silent until the end of the policy year, appellant is deemed to have accepted the policy with the non-conforming provision in it.

### *Negligence of Commercial Lines/Muehleisen*

The impediment to appellant's breach of contract action, just noted, also cripples its action for negligence. Appellant had a duty to read the policy when it was delivered. If, as it now contends, the three-year premium guarantee was a material element, its failure to do so under the circumstances evident here must be regarded as negligent. The negligence claim therefore founders on the shoals of contributory negligence. *See,* in general, Annotation, *Liability of Insurance Agent or Broker on Ground of Inadequacy of Property Insurance Coverage Procured,* 72 A.L.R.3d 747, sec. 12(a), 788 (1976).

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.