731 A.2d 904

BEN LEWIS PLUMBING, HEATING
& AIR CONDITIONING, INC.

v.

LIBERTY MUTUAL INSURANCE COMPANY et al.

No. 91, Sept. Term, 1998.

Court of Appeals of Maryland.

June 15, 1999.

Matthew M. Moore (Timothy G. Casey, all on brief), Rockville, for Petitioner.

David F. Albright (C. Thomas Brown, Albright, Brown & Goertemiller, all on brief), Baltimore, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

In this creditor's action on a running account to which the debtor pled, *inter alia,* a general denial we hold that a defense based on negligent misrepresentation is not precluded by want of a special plea asserting that defense. We also hold, however, that there is no negligent misrepresentation as a matter of law.

The petitioners, defendants in the trial court, are Ben Lewis Plumbing, Heating & Air Conditioning, Inc. and related companies and their principal (collectively Lewis). The respondents are Liberty Mutual Insurance Co. and other companies of the Liberty Mutual Group (collectively Liberty). Liberty's action against Lewis was filed in February 1993 seeking the balance due for premiums on policies issued by Liberty to Lewis that provided a variety of coverages, including workers' compensation. The latter covered Lewis's activities in Maryland and in other nearby jurisdictions where Lewis also did business. The net balance on all lines claimed at trial by Liberty from Lewis was $63,725.70.

Only workers' compensation coverage for the policy period July 1, 1986, through June 30, 1987, under Policy WC–7–581–962477–046 (the Policy) is involved in the dispute between the parties. The premium on the Policy was determined by

retrospective rating.[1]  Liberty is a mutual insurance company, and its board of directors historically had declared dividends payable to policyholders, and, on retrospectively rated policies, dividends are credited against premium, or, if no additional premium is payable, dividends are paid in cash.  The relationship between dividends for a workers' compensation policy period and losses incurred in years subsequent to the policy period based on compensable accidents that occurred during the policy period was governed by the type of plan offered by Liberty and selected by the policyholder.  All of the issues in the instant matter revolve around whether Liberty, having credited Lewis with a dividend in the first adjustment of the Policy premium, could, in later adjustments and because of increased losses chargeable to the Policy period, recover back an amount equal to dividends previously paid.

I

The dispute arises out of the following facts.  Lewis annually requested proposals on its insurance requirements, and

---

1.  L.R. Russ & T.F. Segalla, *Couch on Insurance* § 69:15, at 69–37 through 69–39 (3d ed.1997), describes retrospective rating in part as follows:

"The contract of insurance may provide for the premium to be set retroactively, based upon the insured's actual loss experience, or total payroll during a set period of time.  This method of premium computation, referred to as 'retrospective rating,' usually requires that the insured deposit an advance premium with the insurer.  At the conclusion of the agreed upon period of time, the insurer computes the premium with reference to rate schedules, rules, and its own manuals.  If the premium calculated at the end of the designated time period is less than the premium deposit, the insured will be due a refund....

"The most common use of retrospective rating is in fields where neither the insurer nor the insured has any realistic basis for assessing risks at the beginning of the policy period.  These fields include business liability and workers' compensation, where the nature of the insured entity's activities and the exact compensation of its work force are subject to rather wide variation....  In such circumstances, the insurer usually inserts a provision calling for an 'audit' or 'inspection' during or after the policy period, and applies standard rates to the risk that was actually undertaken."

(Footnotes omitted).

Liberty had provided Lewis's insurance for the two years preceding July 1, 1986. The workers' compensation policy for the year ending June 30, 1986, was written on a plan under which dividends paid on the first readjustment were not subject to repayment based on losses determined at later readjustments. The workers' compensation policy for that period ending June 30, 1986, is not in evidence. Part of the record, however, is a form letter prepared by Liberty and accepted by Lewis by its corporate secretary's signature that presents the dividend plan for that policy period. In relevant part it reads:

"WORKERS' COMPENSATION RETENTION
DIVIDEND PLAN
CONFIRMATION LETTER

"RE: POLICY(IES) #                    Eff. Date 7/1/85

. . . .

"An initial computation of dividends is made in conformity with the Directors' vote approximately ten months after expiration of the policy subject to all applicable legal requirements. The first computation will be considered final, if all claims under the policy are closed. If at the time of the first computation of dividends, there are any open cases such cases will be increased by 25% to determine the indicated dividend.

"If the first computation of dividends is not final, a second computation will be done approximately twelve months after the first.

"The second computation will be considered final if all claims under the policies are closed. If open cases exist at the time of the second adjustment, such cases will be increased by 10% to determine the applicable dividend.

"If the second computation of dividends is not final, a third computation will be done approximately twelve months after the second. If open cases exist at the time of the third adjustment, such cases will not be increased to determine

the applicable dividend. The third computation of dividends will be final.

*"In addition, adverse loss development on the second or third adjustment will not reduce any dividend previously paid to you."*

(Emphasis added).

For the year beginning July 1, 1986, Liberty submitted a proposal to Lewis that included workers' compensation insurance based on Lewis's estimated payroll of $1.82 million. Liberty estimated that the minimum net premium on the Policy would be approximately $32,000 if there were no losses and the maximum net premium would be approximately $140,-000 if losses reached or exceeded $89,600. This proposal contemplated that the coverage would be written on the "Regular Variable Dividend Plan," but that plan's treatment of any dividend to policyholders was not described in the proposal.

As in the two prior years, Liberty's proposal for all lines was submitted to Lewis's corporate secretary, Sally Fink, by an employee representative of Liberty. The employee who submitted the proposal in 1986 was not a witness at trial. Ms. Fink testified that when the Liberty representative delivered the proposal, Ms. Fink asked if "it was the same coverage as we'd gotten. We were with them two years before that, so we could be very brief. She said, 'Yes.'" On or about August 27, 1986, all of the policies, including the thirty-seven page Policy, were delivered to Lewis in a large binder. Also transmitted at that time was a one-page, Liberty-form, confirmation letter referencing the Policy and dated July 1, 1986. Ms. Fink testified that "[o]n receipt of the binder of policies" she telephoned the Liberty representative and "asked her if there was anything I needed to know about them. She said, 'No,' and she requested that I ... sign this form [the confirmation letter], and get it back to her for her files." Ms. Fink signed on behalf of Lewis next to the printed words "Accepted by" and returned the confirmation. That letter in relevant part reads as follows:

**"ALL STATES WORKERS' COMPENSATION
RETENTION DIVIDEND PLAN
CONFIRMATION LETTER WITH REDETERMINATION**

. . . .

"RE: POLICY(IES) # WC7–581–962477–046        Eff. Date 7/1/86

. . . .

"An initial computation of dividends is made in conformity with the Directors' vote approximately ten months after expiration of the policy subject to all applicable legal requirements. The first computation will be considered final, if all claims under the policy are closed.

"Upon *any computation of dividends subsequent to the initial,* if the redetermined dividend is greater than the dividend previously computed, the company shall immediately pay to the insured the additional dividend shown to be due, whereas, *if the redetermined dividend is less than the dividend previously computed, the insured shall immediately refund the amount by which the dividends previously computed exceed the redetermined dividend.*"

(Emphasis added). The above-quoted relevant portions of the July 1, 1986 confirmation letter are, substantially verbatim, the text of an endorsement headed, "Dividend Redetermination Endorsement," that was part of the Policy.

Ms. Fink and management witnesses from Lewis acknowledged that they had read neither the dividend redetermination endorsement nor the 1986 confirmation letter. Their position was that they relied on the representations quoted above and that they were unaware of the change.

In the first retrospective adjustment of the Policy, made in June 1988, Lewis received a total credit of $94,090, but by the fourth retrospective adjustment, made in 1991, the dividend for the Policy period had been completely eliminated by charge backs. Set forth below are summaries of the accountings by Liberty at each annual adjustment of premium and of dividend.

Summaries of
Retrospective Premium and Dividend Adjustments
on Policy WC7–581–962477–046
Covering Policy Period 7–1–86 to 7–1–87

### First Retrospective Adjustment

Made in 1988

Loss—$8,900 (reserve)

| | | | |
|---|---|---|---|
| Premium Adjustment | | | |
| Standard Audited Premium | $137,537 | | |
| First Computation Retro Premium | 83,880 | | |
| | | $53,657 credit | |
| | | | |
| Dividend Adjustment | | | |
| Preliminary Dividend | $ 0 | | |
| First Computation Retro Dividend | 40,423 | | |
| | | 40,423 credit | |
| | | | |
| Balance to Lewis | | | $94,080 |
| Dividend not previously paid | | | 10 |
| | | | $94,090 credit |

### Second Retrospective Adjustment

Made in 1989

Loss—$33,500

| | | | |
|---|---|---|---|
| Premium Adjustment | | | |
| First Computation Retro Premium | $ 83,880 | | |
| Second Computation Retro Premium | 114,433 | | |
| | | $30,553 debit | |
| | | | |
| Dividend Adjustment | | | |
| First Computation Retro Dividend | $ 40,423 | | |
| Second Computation Retro Dividend | 41,456 | | |
| | | 1,033 credit | |
| Balance due Liberty | | | $29,520 debit |

(Audited premium adjusted by $120 to $137,657)

### Third Retrospective Adjustment

Made in 1990

Loss—$70,990

Premium Adjustment

| | | |
|---|---|---|
| Second Computation Retro Premium | $114,433 | |
| Third Computation Retro Premium | 137,537 | |
| | | $23,104 debit |

Dividend Adjustment

| | | |
|---|---|---|
| Second Computation Retro Dividend | $41,456 | |
| Third Computation Retro Dividend | 19,572 | |
| | | 21,884 debit |

| | |
|---|---|
| Balance due Liberty | $44,988 debit |

**Fourth Retrospective Adjustment**

Made in 1991

Loss—$93,100

| | |
|---|---|
| Audited (Maximum) Premium | $137,657 |
| Previous Dividend | $ 19,572 |
| Dividend Offset | $ 19,572 |

(This presentation omits the $10.00 dividend item not subject to retro)

**Fifth and Final Retrospective Adjustment**

Made in 1992
Loss—$98,100

| | |
|---|---|
| Audited (Maximum) Premium | $137,657 |
| Dividend Credit | 0 |

Thus, by the fourth retrospective adjustment, the losses charged to the Policy had caused the premium to reach its maximum, and Liberty charged back against Lewis the remaining balance of the highest amount of dividend that had been credited to Lewis's account.

## II

Liberty sued Lewis in a single count complaint for the balance due on the running account covering all lines. Lewis filed a boilerplate answer containing thirteen numbered defenses, none of which averred any facts and one of which was a general denial under Maryland Rule 2–323(d). Another of the defenses simply named thirteen of the twenty-one affirmative defenses that are listed in Rule 2–323(g). Among these

was "Fraud." The answer did not mention negligent misrepresentation.

Lewis subsequently filed a counterclaim.[2] The counterclaim alleged breach of contract by Liberty and claimed damages of $94,080, the amount credited to Lewis resulting from the first retrospective adjustment of premium and of dividend.[3]

Liberty answered the counterclaim and filed a motion for summary judgment. In its answer to Liberty's motion Lewis stated that "it is not necessary that [Lewis] show that false representations were intentionally made." In addition Lewis's answer to the motion stated that Liberty engaged in fraud or "at least that Liberty [ ] made a false representation of material fact." The circuit court denied Liberty's motion for summary judgment.

The case was tried to a jury. Lewis's defense was that the statements made by Liberty's representative to Ms. Fink constituted a fraudulent or negligent misrepresentation which induced it to accept the Policy. Lewis focused on the difference in the treatment of dividends in readjustments under the contract in effect for the year ending June 30, 1986, and under the Policy, and maintained that the representation was that "dividends" paid on the first readjustment under the Policy could not be readjusted for later losses. Lewis submitted that the misrepresentation had two effects. First, used defensively, the misrepresentation effected a rescission of the Policy so that Liberty's claim for $63,725.70 failed.[4] Second, under

---

2. Only Count II of the counterclaim is relevant to this appeal. Accordingly, we·shall treat the counterclaim as if it consisted only of the matters alleged in Count II.

3. Throughout the proceedings, and at all levels, Lewis includes the $53,657 credit on the first computation of retrospective premium as part of the "dividend." Lewis, however, has not argued that the dividend plan for the period ending June 30, 1986, should be interpreted to include a promise not to readjust premium in addition to dividends.

4. Lewis's assumption is that its loss due to the misrepresentation is $94,080 of "dividends," thus exceeding the $63,725.70 claimed by Liberty.

Lewis's theory the rescission, in turn, gave rise to an implied in fact contract that was based on the representations by the Liberty representative and that was identical, at least as to dividends, with the policy in effect for the period ending June 30, 1986. Its damages on the counterclaim, Lewis argued, were the difference between the $94,080 in "dividends" which had been charged back by Liberty against Lewis and the $63,725 of the charge back that had been utilized by Lewis to offset the claim asserted in Liberty's complaint.[5]

At the conclusion of all of the evidence Liberty orally moved for judgment in its favor on the counterclaim on grounds that we need not consider here. Liberty supplemented the grounds for its motion at the commencement of the next day's proceedings when it argued, in effect, that Lewis could not claim misrepresentation because Lewis had a duty to read the Policy.

The circuit court denied Liberty's motion for judgment, and the complaint and counterclaim were submitted to the jury on special interrogatories. The circuit court's initial instructions did not explain negligent misrepresentation. When the jury sent a note asking for an instruction on that subject the circuit court furnished the jury with a written instruction that modified the pattern jury instruction on the tort of negligent misrepresentation. That instruction includes the element of justifiable reliance.

Set forth below is the jury's verdict.

### "VERDICT SHEET

**"LIABILITY:**

"1. As to Count # 1 of the Complaint: BREACH OF CONTRACT—Do you find that [**Lewis**] is liable to [**Liberty**] for the premium?

                  Yes   √   No     

---

5. Other than to the extent specifically addressed herein, we intimate no opinion on the merits of the theories advanced by Lewis.

"2. Do you find that [**Lewis**] has proved **fraud in the inducement** by clear and convincing evidence?

Yes _____    No ✓

"3. Do you find that [**Lewis**] has proved **negligent misrepresentation** by a preponderance of the evidence?

Yes ✓    No _____

"4. As to Count #2 of the Counter–Complaint: BREACH OF CONTRACT—Do you find that [**Liberty**] is liable to [**Lewis**]?

Yes ✓    No _____

"If your answer to any of the Questions above are "YES," then go to the **DAMAGES** section and award accordingly.

"**DAMAGES:**

"In what amount, if any, do you award [**Liberty**] on the following Count of the **Complaint**?

"a.   Count #1—BREACH OF CONTRACT     $  63,725.00

"Total     $  _____

"In what amount, if any, do you award [**Lewis**] on the following Count of the **Counter–Complaint**?

"a.   Count #2—BREACH OF CONTRACT     $  31,909

"Total     $  _____ "

Immediately following the return of the verdict Lewis orally moved for the court to strike the $63,725 verdict in favor of Liberty on the ground that the jury found that Lewis had proved negligent misrepresentation which was Lewis's defense to the claim for unpaid premiums. The circuit court struck the verdict in favor of Liberty and entered judgment for Lewis for $31,909 on the counterclaim.

Liberty appealed to the Court of Special Appeals which reversed. *Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning, Inc.,* 121 Md.App. 467, 710 A.2d 338 (1998). The Court of Special Appeals held that the defense based on negligent misrepresentation should not have been entertained because Lewis did not plead it as an affirma-

tive defense in its answer. *Id.* at 475–79, 710 A.2d at 342–44. Accordingly, the Court of Special Appeals reversed the circuit court's striking of the verdict in favor of Liberty for $63,725. The intermediate appellate court also held that Lewis's counterclaim should not have been submitted to the jury, relying substantively on *Twelve Knotts Limited Partnership v. Fireman's Fund Insurance Co.*, 87 Md.App. 88, 589 A.2d 105 (1991), and factually on the admitted failure of Lewis to read the Policy. 121 Md.App. at 472–74, 710 A.2d at 341–42. Although the parol evidence rule had not been raised by Liberty by way of objection to Ms. Fink's evidence, or by way of an assigned ground for a motion for judgment, and had not been argued by Liberty in support of reversing the circuit court's judgment on appeal, the Court of Special Appeals observed that the circuit court "should not have allowed Lewis to proceed on its counterclaim" under the parol evidence rule. *Id.* at 475, 710 A.2d at 342.[6]

Lewis petitioned for certiorari and Liberty cross-petitioned, raising alternative grounds in support of the judgment of the Court of Special Appeals. Lewis contends that the intermediate appellate court misinterpreted Maryland Rule 2–323 and that it erred in holding that Lewis could not recover on its counterclaim because its representatives had not read the Policy. From among the questions raised in Liberty's cross-petition we are obliged to consider only those that are essentially the converse of the questions presented by Lewis.

### III

■ In holding that Lewis could not assert negligent misrepresentation as a defense because it had not been affirmatively pleaded, the Court of Special Appeals erred. Sections (a), (d), and (g) of Rule 2–323 come to play in the analysis. In relevant part they read:

---

**6.** *Cf. Creamer v. Helferstay*, 294 Md. 107, 119, 448 A.2d 332, 338 (1982) ("[I]n cases involving unintentional or innocent pre-contractual representations, this Court has regularly adhered to the parol evidence rule.").

"(a) *Content.* A claim for relief is brought to issue by filing an answer. Every defense of law or fact to a claim for relief in a complaint, counterclaim, cross-claim, or third-party claim shall be asserted in an answer. . . . The answer shall be stated in short and plain terms and shall contain the following: (1) the defenses permitted by Rule 2–322(b) that have not been raised by motion, (2) answers to the averments of the claim for relief pursuant to section (c) or (d) of this Rule, and (3) the defenses enumerated in sections (f) and (g) of this Rule.

. . . .

"(d) *General denials in specified causes.* When the action in any count is for breach of contract, debt, or tort and the claim for relief is for money only, a party may answer that count by a general denial of liability.

. . . .

"(g) *Affirmative defenses.* Whether proceeding under section (c) or section (d) of this Rule, a party shall set forth by separate defenses: (1) accord and satisfaction, (2) merger of a claim by arbitration into an award, (3) assumption of risk, (4) discharge in bankruptcy or insolvency from the plaintiff's claim, (5) collateral estoppel as a defense to a claim, (6) contributory negligence, (7) duress, (8) estoppel, (9) fraud, (10) illegality, (11) laches, (12) payment, (13) release, (14) res judicata, (15) statute of frauds, (16) statute of limitations, (17) ultra vires, (18) usury, (19) waiver, (20) privilege, and (21) total or partial charitable immunity.

"In addition, a party may include by separate defense any other matter constituting an avoidance or affirmative defense on legal or equitable grounds."

Negligent misrepresentation is not among the twenty-one affirmative defenses that must be set forth separately. Under the second paragraph of section (g), the defense "may" be pled separately. Nevertheless, the Court of Special Appeals found the requirement for affirmatively pleading negligent misrepresentation in section (a) of the rule, requiring "[e]very defense" to be asserted in an answer, reinforced by the policy that the

pleadings give fair notice. *Liberty Mutual*, 121 Md.App. at 475–79, 710 A.2d at 341–44. The Court of Special Appeals in effect ruled that the defense had been irrevocably waived.[7]

The plain language of section (g) evidences the intent that the class of affirmative defenses that are to be set forth separately in an answer not be open ended. That intent is further evidenced by the Minutes of the Rules Committee meeting of September 14, 1979. After considering each affirmative defense set forth in then Maryland Rule 342, the Committee turned its attention to Federal Rule of Civil Procedure 8(c) and addressed each item enumerated therein. The twentieth item was "[a]ny other matter constituting an avoidance or affirmative defense." Minutes of Sept. 14, 1979 at 16. The Minutes then record the following decision:

> "Several Committee members objected to a 'catch-all' phrase being listed as a requirement. The consensus was that only those items included on the list are required to be specially pleaded. A motion to delete subsection (20) carried."

The Rules Committee next considered that portion of the then draft of proposed Maryland Rule 2–323 that is today the second paragraph of section (g). The background of the discussion was that the rules then in effect provided for a special plea on equitable grounds. 1 Md. Rules of Procedure, Rule 342 d.1. (1983).[8] At the Rules Committee meeting

> "Mr. [now Judge] Niemeyer suggested deletion of 'or any relief on equitable grounds,' in the first sentence. Judge McAuliffe argued that it should be left in, as the new rules will retain pleas on equitable grounds though law and equity

---

**7.** Liberty has not set forth factually how, if at all, it was prejudiced by the absence of a separately stated defense of negligent misrepresentation in Lewis's answer. Thus, the waiver found by the Court of Special Appeals rests entirely on the asserted violation of the rule.

**8.** Former Maryland Rule 342 d.1(a) read: "A party to an action at law in which he, if judgment were obtained, would be entitled to relief against such judgment on equitable grounds, may plead the facts which entitle him to such relief by way of defense."

will be merged to a considerable degree. Mr. Bowie suggested the rewording, 'on legal or equitable grounds.' A motion to substitute the language carried."

Minutes of Sept. 14, 1979, at 17.

*Whaley v. Maryland State Bank,* 58 Md.App. 671, 473 A.2d 1351 (1984), the case on which Lewis principally relies for the recognition of negligent misrepresentation as a defense, held that the defense was to be raised by a plea on equitable grounds. *Id.* at 681, 473 A.2d at 1356. *See also Creamer v. Helferstay,* 294 Md. 107, 116, 448 A.2d 332, 336 (1982). In *Whaley* the defense had not been specially pleaded, and it was held to have been waived. *Whaley,* 58 Md.App. at 682, 473 A.2d at 1357. Today, Rule 2–323 governs the instant matter, and it is clear from the proceedings of the Rules Committee that the former special plea on equitable grounds is now embraced within the second paragraph of section (g) under which a separate statement of the defense is permissive and not mandatory.

Section (a) of Rule 2–323, on which the Court of Special Appeals relied, does emit a contradictory signal. This tension has been noted by commentators. P.V. Niemeyer & L.M. Shuett, *Maryland Rules Commentary* 197 (2d ed.1992) concludes that "[g]ood pleading mandates that all known defenses be stated, even though [Rule 2–323(g) ] specifies that only the listed defenses must be raised." J.A. Lynch & R.W. Bourne, *Modern Maryland Civil Practice* § 6.7(c)(4), at 414 (1993) observes that a construction of Rule 2–323(g) that leaves a defendant free not to plead affirmative defenses that are not mandated by the rule "would foster unfair surprises of a plaintiff as to affirmative defenses not listed."

We need not fully resolve the interrelationship of §§ (a) and (g) of Rule 2–323 in this case. This case is an action for breach of contract and the claim for relief is for money only. We are dealing with one of the specified causes governed by § (d) of the rule. Section (d) retains the general issue plea of common law pleading. Section (d) is a more specific provision then § (a). In the causes specified in § (d) in which a general

denial is filed, it is not necessary for the pleader to assert "[e]very defense of law or fact" in the answer, except for those specifically enumerated in § (g). Inasmuch as Lewis pled a general denial, Lewis did not waive its defense of negligent misrepresentation by not pleading it specially.

*Gilbert v. Washington Suburban Sanitary Comm'n*, 304 Md. 658, 500 A.2d 1039 (1985), relied upon by Liberty to support its waiver argument, is not inconsistent with our holding. Gilbert, a temporary employee, sued the Washington Suburban Sanitary Commission (WSSC) where Gilbert had been assigned by a temporary help agency. The claim was for damages for personal injuries sustained on the job, and WSSC moved to dismiss for lack of jurisdiction over the subject matter on the theory that workers' compensation was the exclusive remedy. We pointed out that the circuit court had jurisdiction so that the motion to dismiss had been improperly granted. We further commented that the question of compensation exclusivity "should have been raised as an affirmative defense," referring in a footnote to the second paragraph of Rule 2–323(g) which permits additional affirmative defenses. *Id.* at 61, 500 A.2d at 1041. The passage relied upon by Liberty is a critique of WSSC's pleading and not a holding that the exclusivity defense was waived. Indeed, we remanded the matter to the trial court for further proceedings to determine whether or not Gilbert was an employee of WSSC and thus, whether the defense applied.

## IV

■ Despite our conclusion in Part III, *supra*, we affirm the judgment of the Court of Special Appeals because the circuit court erred in failing to grant Liberty's motion for judgment at the conclusion of the case on the ground, short-handedly expressed by Liberty, that Lewis had a duty to read the Policy. Liberty relies on *Twelve Knotts Limited Partnership v. Fireman's Fund Insurance Co.*, 87 Md.App. 88, 589 A.2d 105 (1991). There the plaintiff owned numerous investment properties. It circulated a request for proposals for all of its fire, general liability, automobile, and workers' compen-

sation insurance with premiums to be paid annually, or in lesser installments without finance charge. The owner also asked that the premiums be quoted on a three-year basis. The defendant submitted a proposal which included a guarantee that the first year's premium would remain constant over the second and third years.[9] The owner accepted the proposal and paid the first year's premium. At the end of the first year the defendant greatly increased the premium, and the owner-insured sued, unsuccessfully.

In the policy as issued a section of the general conditions, captioned "Premium," stated in relevant part:

> " 'If this policy is issued for a period of three years *and premium is not paid in advance*, the premiums due for each annual period of this policy shall be computed in accordance with the Companies [sic] rules, rates, rating plans, premiums and minimum premium in effect (a) on the inception date of each annual period for annualized policies, or (b) on the inception date of the policy for non-annualized policies.' "

*Id.* at 95, 589 A.2d at 109. (Emphasis added by the *Twelve Knotts* court). The insured claimed, *inter alia,* breach of the contract to procure insurance carrying a guaranteed premium.

On the owner's appeal from a judgment entered on motion at the conclusion of the plaintiff's case, the Court of Special Appeals recognized that the policy's terms did not conform to the proposal accepted by the owner, but the court further said that "the non-conformance was apparent from the policy, and, had [the insured] read the policy conditions, [the insured] would have been immediately aware of the non-conformance." *Id.* at 103, 589 A.2d at 113.

The court further quoted what appeared to it to be the general rule as stated in 12 J.A. Appleman, *Insurance Law and Practice* § 7155, at 533–34 (1981), reading as follows:

---

9. There were actually four defendants in *Twelve Knotts*. We shall speak of them as one for purposes of simplicity.

" '[W]hen the insured accepts a policy, he accepts all of its stipulations, provided they are legal and not contrary to public policy. Where changes from the application appear in the delivered contract, under a more stringent doctrine the insured has a duty to examine it promptly and notify the company immediately of his refusal to accept it. If such policy is accepted or is retained an unreasonable length of time, the insured is presumed to have ratified any changes therein and to have agreed to all its terms.' "

*Twelve Knotts,* 87 Md.App. at 104, 589 A.2d at 113.

Adopting the above-quoted rule, the Court of Special Appeals held that the insured's contract action failed. The court said:

"Appellant is a sophisticated business entity having had previous experience purchasing insurance. The offending policy provision is clear and unambiguous. [The insured partners and their executive director] had an opportunity when the policy was delivered to discover the provision and, if they chose, reject the policy on the ground of non-conformance. Unfortunately, they neglected to do so. By receiving the policy and remaining silent until the end of the policy year, appellant is deemed to have accepted the policy with the non-conforming provision in it."

*Id.* at 104–05, 589 A.2d at 113–14.

We need not express here agreement or disagreement with the result in *Twelve Knotts* because the case now before us is a stronger case for application of the rule applied in *Twelve Knotts.* The misrepresentation on which Lewis relies is the statement by the Liberty representative to Ms. Fink, made at the time of the proposal, that the "coverage" proposed to be issued for the year beginning July 1, 1986, would be the same as that under the policies then in effect. But that is not all that occurred. When Liberty later transmitted the issued policies Liberty also sent, separate from the binder of policies, the one-page confirmation letter that set forth the dividend redetermination endorsement that was part of the Policy. The terms of that confirmation letter (and of the endorsement)

are clear and unambiguous. Further, Liberty requested that Ms. Fink sign the confirmation letter next to the words "Accepted by," and she in fact signed it and sent it to Liberty.

By obtaining Lewis's written acceptance of the dividend endorsement Liberty was complying with the notice requirements that were recognized in *Government Employees Insurance Co. v. Ropka,* 74 Md.App. 249, 536 A.2d 1214 (1988). There the court said:

> "Most jurisdictions impose an affirmative duty on the insurer to make the insured aware of changes inserted into a renewal policy; absent notice of the change, the insured is entitle to coverage as the policy originally stated."

*Id.* at 267, 536 A.2d at 1223. The court cited numerous authorities including *Bauman v. Royal Indemnity Co.,* 36 N.J. 12, 25, 174 A.2d 585, 591–92 (1961), where the New Jersey Supreme Court said:

> " '[W]here ... the insurance company simply sends a renewal policy for the new period of coverage, the insured, in all likelihood, will not read it over again and may not fairly be expected to do so. Absent notification that there have been changes in the restrictions, conditions or limitations of the policy, the insured is justly entitled to assume that they remain the same and that his coverage has not in anywise been lessened.' "

*Ropka,* 74 Md.App. at 268, 536 A.2d at 1223.

*J.A.M. Associates v. Western World Insurance Co.,* 95 Md.App. 695, 622 A.2d 818 (1993), involved a change—insertion of a lead paint exclusion—on the renewal of a liability policy insuring property owners. The court affirmed the refusal by the trial court to reform the policy to include coverage for lead paint caused injuries. Based on the information that the insured could have drawn from four factors, none of which was so clear cut as having the insured accept the new provision in writing, the court held that there was sufficient notice of the change. Relevant to the instant matter is the court's explanation of why notice of the change is required.

"To a large extent, the requirement of notice proceeds from an ambiguity in the word 'renewal,' which the public may, with some good reason, regard as synonymous with 'extension'—a continuation of the existing policy for another term. Thus, as a matter of fairness and of assuring mutual assent to what is, in reality, a new contract, the law requires that reasonable notice be given to the insured if the insurer intends to make a significant change in the new policy."

*Id.* at 704, 622 A.2d at 822.

The statement by Liberty's representative on which Lewis relies as a misrepresentation leads to the same conclusion that an insured, absent other facts, ordinarily may reasonably draw in a renewal context. But, in the instant matter, the assent of the insured to the change is manifested by Lewis's signature on the confirmation letter. Thus the ordinary conclusion is negated in this case. In terms of the defense of negligent misrepresentation, there was legally insufficient evidence of a reliance on the asserted misrepresentation that was justifiable.

Absent a triable issue of justifiable reliance the issue of negligent misrepresentation should not have been submitted to the jury. Accordingly, under Lewis's theory of the case, no implied contract came into being and judgment on the counterclaim should have been entered on motion in favor of Liberty. Although Liberty's motion for judgment did not expressly include judgment in its favor on its claim (negligent misrepresentation having been the only defense) the jury found in favor of Liberty on the complaint so that any procedural deficiency is moot.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS, BEN LEWIS PLUMBING, HEATING & AIR CONDITIONING, INC.**