802 A.2d 1050

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

v.

WILLIS CORROON CORPORATION OF MARYLAND.

No. 113, Sept. Term, 2001.

Court of Appeals of Maryland.

July 18, 2002.

Mark H. Kolman (Robyn R. Bender and Katherine J. Henry of Dicstein, Shapiro, Morin & Oshinsky, LLP, on brief) Washington, DC, for appellant.

Edward J. Baines (Jennifer Brune Speargas and Patrick E. Clark of Saul Ewing LLP, on brief) Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

Title 29 U.S.C. § 502(a), which is part of the Federal Labor Management Reporting and Disclosure Act. (LMRDA), requires that officials of labor organizations who handle funds or other property of the organization be bonded, in order to provide protection against loss by reason of fraud or dishonesty on the part of those officials, either directly or through connivance with others. The statute requires that the bond "of each such person" be in an amount not less than 10% of the funds handled by that person during the preceding fiscal year, up to $500,000. *See also* 29 C.F.R. part 453 (supplementing that requirement).

Petitioner, International Brotherhood of Teamsters (IBT), is a labor organization subject to the requirements of § 502. Among the officers required to be bonded in 1996 were IBT's President, Ron Carey, and its Director of Government Affairs, William Hamilton. IBT employed respondent, Willis Corroon Corporation of Maryland (Willis), an insurance broker, to obtain the fidelity bond insurance mandated by § 502. The policy procured by Willis from National Union Fire Insurance Company (National Union) for the period from April, 1996–April, 1997 limited the insurer's liability to $500,000 "per loss," rather than $500,000 per person covered. During that policy year, Carey and Hamilton, acting in concert, misappropriated over $906,000 of union funds as part of an unlawful scheme to help finance Carey's bid for reelection. Their conduct necessitated a new election, which cost the union an additional $2 million.

IBT made a claim on its policy to recover $1 million of that loss, $500,000 for each of the two bonded officials, and, when National Union resisted the claim, IBT filed suit on the policy. We are not privy to the record in that case or to all of the various defenses that may have been raised by National Union, but one of the defenses, presumably, was that the policy limit was $500,000 "per loss." Faced at least with that,

IBT settled the suit for $425,000 and released National Union from further liability. The release expressly reserved to IBT any claim that it might have against any insurance broker involved in the procurement of the policy.

In an effort to obtain additional compensation for its loss, IBT sued Willis in the Circuit Court for Montgomery County for negligence and "breach of fiduciary duty."[1] It alleged that (1) Willis held itself out to IBT as possessing special expertise, knowledge, and skill in the field of insurance, (2) Willis knew or should have known that LMRDA required IBT to bond each of its officers who handled union funds, separately, in the amount of $500,000, (3) IBT chose Willis as its insurance broker and relied on its expertise to procure a policy that would comply with LMRDA, (4) Willis procured from National Union a Form A policy that contained a policy limit of $500,000 "per loss," rather than the Form B policy offered by National Union that provided separate coverage for each employee, acting alone or in collusion with others, (5) during the policy year, Hamilton diverted a total of $735,000 in union funds to third parties in exchange for illegal contributions to Carey's reelection campaign and unlawfully transferred an additional $150,000 to the AFL–CIO, (6) it was subsequently discovered that IBT was defrauded of an additional $21,532 through improper billing of Carey's election campaign expenses to IBT, (7) rerun of the election cost IBT an additional $2 million, (8) a Form B policy, covering Carey and Hamilton separately, would have covered $1 million of the total loss, but (9) National Union paid only $425,000 of the loss under its Form A policy. Averring that Willis had, and breached, a duty to obtain a policy that complied with LMRDA, IBT sought $575,000 in compensatory damages, plus

---

1. In *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 520–21 (1997), we pointed out that, although the breach of a fiduciary duty may give rise to one or more causes of action, in tort or in contract, Maryland does not recognize a separate tort action for breach of fiduciary duty. Based on the underlying averments, IBT may have been able to plead an action for breach of contract, in addition to its claim for negligence, but it chose not to do so. We shall treat the complaint as one for negligence.

interest, recovery of commissions and fees paid to Willis, and attorneys' fees incurred in the action against National Union.

Willis answered the complaint and, relying principally · on *Twelve Knotts v. Fireman's Ins. Co.*, 87 Md.App. 88, 589 A.2d 105 (1991), moved for summary judgment on the ground that, by not reading the policy procured by Willis and thereby discovering, at the outset, the limitation of liability contained therein, IBT was contributorily negligent as a matter of law. The Circuit Court credited that defense, and, as contributory negligence is an absolute defense in Maryland to an action for negligence, the court granted the motion and entered judgment for Willis. IBT appealed, and we granted *certiorari*, on our own initiative and prior to any proceedings in the Court of Special Appeals, to review that judgment. We shall reverse.

## THE FACTS

Because the case was decided on summary judgment, we must view the evidence presented to the court, and all reasonable inferences fairly deducible from that evidence, in a light most favorable to IBT. *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 728 (2001). The question, then, is whether, viewing the evidence in that light, there was any basis upon which a trier of fact could lawfully find for IBT.

Certain facts, at this stage, are essentially undisputed, among them being (1) the statutory requirement, embodied in § 502(a), that IBT have in place, for each officer handling union funds or property, a bond in an amount not less than 10% of the funds handled by that officer in the preceding year, (2) that, for Carey and Hamilton, the required amount was $500,000 each, (3) that the "per person" coverage required by the statute was not afforded by the Form A policy procured by Willis, and (4) that a Form B policy would have afforded that "per person" coverage. In response to discovery requests, Willis admitted that it possessed and held itself out as possessing knowledge or expertise relating to fidelity bond coverage for labor organizations and the procuring of fidelity bond coverage. It admitted as well that it had knowledge of

LMRDA bonding requirements for officers and employees of labor organizations, but denied that it had never asked any insurer to offer a Form B policy and that the insurers it contacted were willing to offer such a policy.

Willis began serving as IBT's insurance broker in 1985 and, from that year until 1997, it procured for IBT a Form A fidelity bond providing "per loss" coverage. From 1985 through 1988, the policy was issued by Delta Insurance Company; from 1988 through 1995, it was issued by Reliance Insurance Company. In 1995, IBT expressed some dissatisfaction with Reliance and requested Willis to find another insurer. Either in connection with that request or at some earlier point, IBT sent to Willis a copy of the LMRDA bonding requirement. On April 3, 1995, Willis sent to IBT a written proposal that contained a brief statement of policy coverage, quotations from Reliance, National Union, and Lloyd's of London, an outline of coverage under a proposed National Union policy, a specimen of National Union Form A policy, and a copy of the A.M. Best rating for National Union.

The statement of policy coverage noted that the coverage was "Employee Dishonesty Coverage–Form A," that the limit was $500,000 (without explanation as to whether that limit was "per loss" or "per employee"), and that the form was "Standard Industry Form, modified by endorsements as applicable by company—Simplified Form." The outline of coverage, entitled "Proposed Fidelity Bond Coverage," stated that the policy would provide coverage for loss of money, securities, or other property "resulting directly from one or more fraudulent or dishonest acts committed by an Employee acting alone or in collusion with others." Nothing was said in this statement about the limit of liability other than that the limit would not be cumulative from year to year or period to period. The specimen policy, which conformed to the policy actually issued, contained a Table of Limits of Liability that stated a limit of $500,000 under "Insuring Agreement I Employee Dishonesty Coverage–Form A." That Insuring Agreement provided coverage for loss of money, securities, and other property "to an amount not exceeding in the aggregate the amount stated in

the Table of Limits of Liability applicable to this Insuring Agreement I, resulting directly from one or more fraudulent or dishonest acts committed by an Employee, acting alone or in collusion with others." The specimen policy also stated that "[p]ayment of loss under Insuring Agreement I . . . shall not reduce the Company's liability for other losses under the applicable Insuring Agreement whenever sustained" and that the company's "total liability [] under Insuring Agreement I for all loss caused by any Employee or in which such Employee is concerned or implicated . . . is limited to the applicable amount of insurance specified in the Table of Limits of Liability or endorsement amendatory thereto."

In furtherance of this proposal, a senior vice-president of Willis met with IBT officials to discuss the matter. Without ever questioning the policy limit, IBT accepted the National Union offer.

In early April, 1996, when the policy was up for renewal, Willis and IBT had another meeting, and the decision was made to renew. On or about April 5, 1996, Willis sent a binder to IBT. In an accompanying "Fidelity Bond Fact Sheet," it stated the limit of liability as "$500,000 per loss" and characterized the coverage as direct loss of money, securities, or other property due to the dishonest or fraudulent act "of one or more 'Employees' acting alone or in collusion with others." A covering letter informed IBT that, other than a different policy number, there were no changes from the existing policy.

Willis's motion for summary judgment was based, in part, on the assertion that it had done nothing to misrepresent or conceal any relevant facts from IBT, that the policy and submissions made clear that the policy limit was on a "per loss" basis, and that, under the doctrine applied in *Twelve Knotts*, IBT had a duty to read the policy and was negligent in not doing so. Had it read the policy, Willis claimed, IBT would have known that the limit was on a "per loss" basis. At one point, it suggested that the statute did not actually require a "per person" limit, and one of its officials, Stephen Leggett,

testified in deposition that, until shortly before the deposition, he believed that the policy was in compliance with the statute and that, because of that mistaken belief, he did not advise IBT that the policy was not in compliance. IBT argued, and produced affidavit evidence to establish, that it had chosen Willis as its broker because of Willis's asserted expertise, that it had informed Willis of the LMRDA requirements, and that it had relied on Willis to assure that the policy conformed to those requirements. An expert witness for IBT, in deposition testimony, faulted Willis for not making clear to IBT that the proposed National Union policy did not comply with LMRDA. He opined that the information regarding the limit of liability was ambiguous and that providing the actual policy language would not suffice because insureds "[do] not necessarily understand all those things, and I think it's an obligation for the agent to point those things out."

At a hearing on the motion, the court found the case indistinguishable from *Twelve Knotts* and, on that basis, granted the motion and directed the entry of judgment for Willis.

## DISCUSSION

### Existing Maryland Case Law

The appellate courts in Maryland have addressed the issue raised here in four cases, each involving a different factual circumstance that dictated the outcome. In *Twelve Knotts*— the first of the cases—the Court of Special Appeals had before it a complaint by a real estate holding company against two insurance companies and a broker (Commercial Lines). When its current fire, general liability, and workers' compensation insurance policies were about to expire, Twelve Knotts issued a general request for proposals to replace that insurance. The request specified that policies be quoted on a three-year basis with premiums payable in annual installments but did not require that the premium be fixed or capped for the three-year period. Commercial Lines submitted a written proposal for the various lines of insurance. The proposal for fire

insurance showed an annual premium payable in monthly installments. Although the written proposal submitted by Commercial Lines said nothing about a three-year guarantee of the premium, its president informed Twelve Knotts' executive director that the quoted premium was good for three years. The company opted for the Commercial Lines proposal, in part because it was 35% less expensive than the competing proposals and in part because, even though not included in the company's request for proposals, the rate was to be guaranteed for three years.

The binder for the property insurance forwarded by Commercial Lines showed the premium as quoted but said nothing about its being guaranteed. In ordering the permanent policy a month later, Commercial Lines noted that there was to be a three-year guarantee *and* that the premium was to be paid in monthly installments. The policy that was issued was not consistent with that request, however, but provided, instead, that, unless the full three-year premium was paid in advance, the premiums for the second and third years would be in accordance with the insurer's then applicable schedule. In forwarding the policy to the company two months after receiving it from the insurer, the broker said nothing about the requirement for advance payment—a condition that, by then, could not have been met in any event. At the end of the first year, the insurer insisted on a much higher premium for renewal, which ultimately led to a multi-count action alleging fraud, negligent misrepresentation, and breach of contract. The Circuit Court entered judgment for the defendants, and the Court of Special Appeals affirmed.

With respect to the fraud and misrepresentation claims, the Court of Special Appeals concluded that there was no evidence to support them—none of the defendants had misrepresented or attempted to conceal what was contained in the policy. The relevance of the case lies in the court's discussion of the breach of contract and negligence claims—both of which were founded on the assertion that the policy did not conform to the proposal that was made by Commercial Lines and accepted by the company or to the terms of Commercial Lines' request of

the insurer. The insured was promised and expected a policy whose premiums were *both* guaranteed for three years *and* could be paid in installments, and it got, instead, a policy whose premiums were guaranteed for three years only if paid in advance. The court noted that the non-conformance was apparent from the policy, however, and adopted what it regarded as the majority rule that, when an insured accepts a policy, he or she accepts all of its lawful terms, and, if the policy differs from the application, the insured has a duty to notify the insurer and either negotiate the matter or reject the policy. In the particular case, it observed that the insured was a sophisticated business entity with previous experience in purchasing insurance, that the offending provision was clear and unambiguous, and that it had an opportunity when the policy was delivered to discover the discrepancy and reject the policy on the ground of non-conformance.

There was no indication in *Twelve Knotts* that the insured relied on any particular expertise of the broker to produce a policy with certain specific terms. It engaged in competitive bidding to replace various lines of general business insurance with which it was familiar and adopted the Commercial Lines proposal because it offered the best terms, both in terms of price and the three-year guarantee of the annual premium. The one discrepancy, as noted, concerned the stability of the premium, and that discrepancy was readily apparent from the policy. It was not necessary for the insured, who had a professional employee charged with procurement of the insurance, to have to read the entire policy or attempt to fathom complex or technical provisions in it to become aware that, unless the full three-year premium was paid in advance, the premiums could change at the end of the first and second years. If the guarantee was truly material, the insured could have rejected the policy.

The court had before it a quite different situation in *Johnson & Higgins v. Hale,* 121 Md.App. 426, 710 A.2d 318 (1998). The insured, Hale, was a trucking company that decided to expand its business to include marine transport. Having no experience in that line of business, Hale retained Johnson &

Higgins, self-reputed to be one of the most knowledgeable brokers in the country, and relied upon that broker to obtain proper coverage for the maritime operation. Each of the policies obtained by the broker contained an exclusion for cargo requiring refrigeration unless (1) the space and other conditions were surveyed by a competent surveyor prior to the voyage and found fit, and (2) accepted for transportation under a form of contract approved in writing by the insurer.

At some point, Hale chartered a ship to carry certain refrigerated cargo, and after recognizing the practical difficulty Hale would have in complying with the conditions in the exclusion with respect to a chartered vessel, the broker persuaded the insurer to delete that exemption with respect to the chartered ship. It failed to have the clause deleted with respect to the more routine tug and barge method of transport, however. Later, Hale informed the broker that it was no longer using the chartered ship but had reverted to tug and barge and, without expressly requesting that the exclusion be deleted, asked the broker to make the appropriate changes to the policy. Hale assumed that the coverage would remain the same as it had been for the chartered ship, and was never told to the contrary, but the broker failed to have the exclusion deleted. When Hale suffered a loss because of spoilage and the insurer, relying on the exclusion, declined to cover it because the two conditions for coverage of refrigerated cargo had not been met, Hale sued the broker for negligence and breach of contract. Relying on *Twelve Knotts*, the broker defended on the ground that, had Hale read the policy, it would have known that the exclusion was not deleted, and that, by not doing so, it was contributorily negligent as a matter of law. The lower court rejected that defense and allowed the case to go to a jury, which found for the insured.

The Court of Special Appeals affirmed the judgment, finding that Hale "placed a much greater degree of justifiable reliance upon [the broker] than that placed upon Commercial Lines by the limited partnership in *Twelve Knotts*." *Johnson & Higgins, supra,* 121 Md.App. at 441, 710 A.2d at 325. It concluded, therefore, that Hale was not negligent and that the

breach of contract action was not barred, at least as a matter of law. Part of the evidence, which the appellate court found was properly admitted, was an expert opinion that, because of the complexity of a marine insurance policy, Hale, despite his general business experience, would have difficulty understanding the policy, and, in particular, the requirements of the refrigeration exclusion. In the appellate court's view, the jury could properly have concluded that the broker had a duty to advise Hale of the terms of the policy and, due to the practical difficulty in complying with its conditions, even in a barge operation, to have the exclusion clause deleted from the policy.

In *Ben Lewis Plumbing v. Liberty Mutual*, 354 Md. 452, 731 A.2d 904 (1999), the dispute concerned a retrospective rating clause in a workers' compensation policy. Under that clause, the insured made a deposit in advance toward the premium, but the actual premium was determined by end-of-year adjustments based on the insured's claims experience during the year. The policy allowed up to three such adjustments, depending on whether there were open claims at the time of the first and second adjustments; if the premium was adjusted upward, the insured paid the difference, if it was lowered, the insurer refunded the difference.

The disagreement arose from the fact that the insurer was a mutual company that declared dividends to its shareholder-insureds based on its profit/loss experience during the year. The policies in effect for the two years prior to the one in question provided that dividends payable to the insured were not subject to recalculation based on losses determined after the first readjustment. That provision was changed in the 1986–87 policy, to allow recalculation of the dividend based on a redetermination of the premium at *any* of the adjustments.

After the end of that policy year, the insurer reduced the dividend as the result of losses determined in the second and third adjustments, and Lewis sued for negligent misrepresentation, based on an oral assertion by the insurer's employee that the new policy contained the "same coverage" as the previous policies. Relying on *Twelve Knotts*, the insurer

defended on the ground that the change was noted in the policy, which Lewis had a duty to read. Though expressing neither agreement nor disagreement with the result reached by the Court of Special Appeals in *Twelve Knotts*, we found telling the fact that the binder for the 1986–87 year was accompanied by a separate confirmation letter that set forth in clear terms the new dividend redetermination endorsement, a letter that Lewis was asked to sign and that Lewis did sign and return to the insurer. Although we, at least tacitly, adopted the common law rule that insurers have a duty to make the insured aware of any changes inserted in a renewal policy and that, absent notice of such a change, the insured is entitled to assume that the coverage, conditions, and limitations are the same, we noted that, through the confirmation letter, sufficient notice of the change *was* given.[2] Accordingly, we held that there was legally insufficient evidence of justifiable reliance on the oral statement of the insurer's employee.

The last case in which the issue of the insured's duty to read the policy was raised is *CIGNA v. Zeitler*, 126 Md.App. 444, 730 A.2d 248 (1999), involving a marine insurance policy on a pleasure boat. Until 1994, because the boat was available for charter, it was covered under a fleet policy purchased by the charter company that stored the boat for the owner, Zeitler. That policy covered the boat when cruising in the Caribbean. In the fall of 1994, however, the boat was deleted from the fleet coverage and insured separately, with the same company, CIGNA, as a pleasure craft. The new policy excluded coverage for the Caribbean after July 1—the beginning of the

---

**2.** We omitted to note that, since 1981, a Maryland Insurance Administration regulation has required that, if an insurer, upon renewal or by endorsement, initiates any change in any primary property or casualty policy, other than a change requested by the insured, that eliminates or reduces benefits, the insurer must give the insured written notice of the change. The regulation further provides, in effect, that, if the required notice is not given and a claim occurs that is affected by the change, the change is not effective. The regulation, by its own terms, is declared inapplicable to commercial risks that use the services of a risk manager, broker, or insurance adviser. *See* COMAR 31.08.05, formerly COMAR 09.30.32.

hurricane season. Zeitler took the boat to the Caribbean in the fall of 1994 and left it there, on the island of St. Maarten. In September, 1995, a hurricane hit the island and destroyed the boat. When CIGNA denied coverage, Zeitler sued it and the broker who placed the insurance.

Among other defenses, both CIGNA and the broker argued that the breach of contract and negligence claims were doomed by Zeitler's failure to read the new policy, which would have alerted him to the exclusion. The trial court denied defense motions and allowed the case to go to the jury, which found for Zeitler. Affirming the judgment, the Court of Special Appeals noted that there was a genuine dispute as to whether Zeitler had received the new policy prior to the loss, and, on that basis alone, the issue was properly one for the jury. It concluded, further, that there was sufficient evidence to establish that the new policy was, in effect, a renewal and that, as the new term was not pointed out by the broker, Zeitler could reasonably have assumed that the coverage was the same.

### *Analysis and Conclusion*

It is generally accepted, and not really at issue in this case, that, when an insurance broker is employed to obtain a policy that covers certain risks and the broker fails (1) to obtain a policy that covers those risks, and (2) to inform the employer that the policy does not cover the risks sought to be covered, an action may lie against the broker, either in contract or in tort. *See* 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 46:59 (1997); 16A John Alan Appleman & Sean Appleman, Insurance Law and Practice § 8831 (1981 & 2002 Supp.); Robin C. Miller, Annotation, *Liability of Insurance Agent or Broker on Ground of Inadequacy of Liability–Insurance Coverage Procured,* 60 A.L.R. 5th 165 (1998). The issue in the case concerns one of the defenses often asserted in such an action—that the omission or provision that serves to limit or eliminate the expected coverage was explicit in the policy and had the employer read the policy, he or she would have known of the problem.

 That defense has been asserted to both breach of contract and negligence claims, sometimes successfully, sometimes not. In addition to the Maryland cases discussed above, see the cases cited in 60 A.L.R. 5th 165, *supra*, §§ 6 and 7. With respect to contract claims, Appleman states that, "when the insured accepts a policy, he accepts all of its stipulations, provided they are legal and not contrary to public policy," that, subject to certain exceptions and caveats, the insured "has a duty to examine [the policy] promptly and notify the company immediately of his refusal to accept it," and that "[i]f such policy is accepted or is retained an unreasonable length of time, the insured is presumed to have ratified any changes therein and to have agreed to all its terms." APPLEMAN, *supra*, § 7155.[3] The alleged duty to read the policy also lies at the heart of the contributory negligence defense asserted to

---

3. The first part of that statement—that, if an insured accepts a policy, he or she accepts all of its lawful terms and conditions—is probably correct. Whether mere retention of the policy without protest constitutes an acceptance is not so clear, however. As a general rule of contract law, silence and inaction upon receipt of an offer do not constitute an acceptance of the offer. One exception to that rule is where, "because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." RESTATEMENT OF CONTRACTS (SECOND) § 69 (1981); 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 3.21 (Rev. ed.1993); *cf. Porter v. General Boiler Casing Co.*, 284 Md. 402, 412, 396 A.2d 1090, 1095–96 (1979); *GEICO v. Medical Services*, 322 Md. 645, 655, 589 A.2d 464, 468–69 (1991) (silence and inaction can operate as an acceptance of an offer in a few limited circumstances). Corbin observes, in that regard, that it is the custom of insurance agents to send an insured a renewal policy with a bill for the premium shortly before expiration of the current policy and that the course of dealing between the agent and insured may be such as to justify that procedure and cause the insured's silence and failure to return the policy to operate as an acceptance of the renewal offer. CORBIN, *supra*, § 3.21. He points out that a different result is reached, however, if there was no such previous course of dealing "or if the new policy that is sent is different from the existing one as to the extent of coverage, the amount of premium, or in other material respects." *Id.* Compare *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal.App.4th 1372, 25 Cal.Rptr.2d 242 (Cal.App.1993) *with Preferred Risk Ins. Co. v. Central Surety & Ins. Corp.*, 191 F.Supp. 797 (W.D.Ark.1961). We need not decide this issue here. It is clear that IBT did accept the policy for 1996. It paid the premiums and sought, with at least partial success, to enforce the policy.

a claim of negligence on the part of the broker. If that duty is breached and the breach constitutes at least a contributing cause of the loss complained of—the lack of coverage—there can be no recovery. In either case, the focus is on whether, and under what circumstances, the insured has a duty to read the policy and discover for himself or herself whether it contains the provisions he or she applied for or was led to believe the policy contained.

Some courts and commentators have, indeed, indicated that such a duty exists and, as we have seen, have, on occasion, found no cause of action against a broker or insurer when the insured has failed to satisfy that duty. That has never been a universal rule, however. Couch opines that an insured's failure to read the policy "has traditionally been held *not* to be a defense to an action against the agent for failure to procure insurance, on the reasoning that the principal is entitled to assume that the agent performed his or her duty" but notes that "some courts have allowed the defense, especially if the insured was knowledgeable." COUCH, *supra*, § 46:69 (1995) (emphasis added).

■ A fair reading of the cases and the more recent commentary as to negligence actions suggests that the duty is not necessarily to read the policy but simply to act reasonably under the circumstances. In some settings, acting reasonably may well require the insured to check parts of the policy or accompanying documents; in many settings, it will not. The duty to check the policy is essentially the flip side of the extent to which the insured reasonably may rely on the agent, broker, or insurer's having produced the terms and coverages for which the insured bargained or applied. Couch notes, in that regard, that "[i]n some instances, the question has been recharacterized by courts which have stated that the issue is not whether the insured read the policy but rather is the reasonableness of his or her reliance on the agent's representation that the policy as worded actually covered the risk for which insurance was requested." *Id.*

Citing *Darner Motor Sales v. Universal Underwriters*, 140 Ariz. 383, 682 P.2d 388 (1984), Appleman points out that the failure to read a "lengthy and forbidding" policy has been held not to bind an insured, as a matter of law, to "boilerplate policy provisions that are inconsistent with the insured's understanding of the coverage provided resulting from negotiations with and representations made by the insurance agent." APPLEMAN, *supra*, § 7155 (2002 Supp.). In the supplement to § 8831, Appleman observes:

> "The general rule requiring an insured to read and examine an insurance policy to determine whether the coverage desired has been furnished has exceptions: (1) for when the agent has held himself out as an expert and the insured has reasonably relied on the agent's expertise to identify and procure the correct amount or type of insurance, unless an examination of the policy would have made it readily apparent that the coverage was not issued; and (2) for where the evidence reflects a special relationship of trust or other unusual circumstance(s) which would have prevented or excused the insured from the duty to exercise ordinary diligence to ensure that no ambiguity existed between the requested insurance and that which was issued."

*Id.* at § 8831 (2002 Supp.).

■ Because the issue in a negligence action is the reasonableness of the insured's conduct, it normally will be fact-specific and therefore, where there is any genuine dispute of relevant fact, for the trier of fact to determine. Relevant considerations would include whether the policy was a new one or a renewal, how much reliance was justifiably placed in the agent or broker by the insured, the nature of any past dealings between the insured and the broker, agent, or insurer, what information the insured was given about the policy, how difficult it would have been for the insured to learn of and appreciate any discrepancy, and whether any conduct on the part of the broker, agent, or insurer reasonably served to preclude an investigation by the insured.

Applying those principles to the record before us, it is clear that summary judgment was inappropriate. As we have recounted, there was evidence that IBT chose and relied upon Willis as an expert in the field to procure a policy that complied with the requirements of LMRDA, and, in particular, § 502(a), and, despite Willis's refusal to admit the fact, that a Form B policy providing the required coverage could have been obtained. Although the Fidelity Bond Fact Sheet supplied to IBT in connection with the 1996 renewal policy stated the limit of liability as $500,000 "per loss," when coupled with the policy language itself and the other documents that were supplied by Willis, we are not convinced, *as a matter of law,* that union officials having no special expertise in insurance language and relying on Willis to assure compliance, would have spotted the non-compliance even if they had read the policy carefully. It is significant, in that regard, that even Willis's employee was unaware of the non-compliance. On this record, a jury could reasonably find that IBT acted reasonably in relying on Willis to procure a proper policy and in not making its own independent investigation.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS; APPELLEE TO PAY THE COSTS.