875 A.2d 222

**Yelena VINOGRADOVA**

v.

**SUNTRUST BANK, INCORPORATED.**

**No. 0577, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 3, 2005.

---

**496**

Brian L. Schwalb (David N. Geier, Schwalb, Donnenfeld, PC, on the brief), Washington, DC, for appellant.

Vernon W. Johnson, III (Jackson & Campbell, PC, on the brief), Washington, DC, for appellee.

Panel: HOLLANDER, SHARER and THEODORE G. BLOOM (Ret. Specially Assigned), JJ.

THEODORE G. BLOOM, Judge, Retired, Specially Assigned.

Appellant, Yelena Vinogradova, sustained investment and other losses of almost one million dollars, allegedly due to the

actions of Igor Besson, a friend and advisor acting under a broad power of attorney in his management of appellant's funds and investment accounts at SunTrust Bank. She filed, in the Circuit Court for Montgomery County, a complaint, alleging breach of fiduciary duty and negligence, against appellees, SunTrust Bank, Inc., and SunTrust Securities, Inc. (collectively, "SunTrust"), and Maarten Rietveld, the SunTrust account representative who had assisted Ms. Vinogradova in opening her accounts at the bank.[1]

Ms. Vinogradova appeals from the circuit court's grant of summary judgment against her on the first count of her complaint, asserting a claim for negligence, and dismissing the second count, which asserted a claim for breach of fiduciary duty. She presents the following arguments:

I.  Financial institutions, like SunTrust, owe customers, like Yelena, a duty to advise and warn of suspicious account activity committed by customers' agents.

II.  The circuit court erred in granting summary judgment on Yelena's negligence claim despite material factual issues in genuine dispute.

III.  The circuit court erred in dismissing Yelena's breach of fiduciary duty claim.

For the reasons set forth below, we shall affirm the circuit court's judgment.

## FACTS AND LEGAL PROCEEDINGS

Ms. Vinogradova emigrated to the United States from Russia in 1990. She speaks limited English and relies largely on interpreters. A former international ballet dancer, Ms. Vinogradova now serves as the Director of the Universal Ballet Company in Washington, D.C.

---

1.  It is assumed that Ms. Vinogradova did not file suit against Besson, himself, because, according to her counsel's representation at the summary judgment hearing, Besson filed a series of bankruptcies in the United States District Court in Greenbelt "and then disappeared."

There is no dispute about Ms. Vinogradova being an unsophisticated investor. She apparently met Besson while she was training Besson's daughter in ballet. In 1997, with Besson's help, Ms. Vinogradova opened six brokerage accounts, including one retirement account, at the Chevy Chase branch of SunTrust (then Crestar Bank). Her account representative at SunTrust was Rietveld.

Ms. Vinogradova executed a General And Specific Durable Power of Attorney (POA) on 16 October 1997, designating Besson as her Attorney–in–Fact and granting him total actual authority over the funds in her accounts. She also executed an Advance Medical Directive, naming Besson a contingent agent to make health care decisions on her behalf should she become incapable of doing so, and a will naming Besson a contingent beneficiary and making him the Executor of her estate and Trustee of trusts created by her Will.

The broad POA contained, *inter alia,* the following language:

[Igor Besson] is authorized to act for me as follows:

(1) To ... hold any and all moneys, securities, and other property, of any nature whatsoever ...;

. . .

(3) To write checks upon or otherwise withdraw all funds or account balances now or hereafter outstanding to my credit or the credit of [Besson], whether or not the check or other instrument is drawn to the order of [Besson];

(4) To ... sell or otherwise dispose of, ... and to transfer, redeem, convert, or exchange any security that now belongs to me or may belong to me in the future or in which I may have an interest[;] ...

(5) To buy, acquire, or invest in property, real or personal, tangible or intangible, including but not limited to any security, option, or other type of investment of whatever kind and nature; ...

. . .

(9)  To open accounts of whatsoever nature in my name or in the name of [Besson][.]"

It is undisputed that Ms. Vinogradova signed the POA and recognized Besson as her appointed agent.

Thereafter, the balances in Ms. Vinogradova's various accounts declined substantially. She places the amount of her losses at $935,000. For purposes of this opinion, we shall adopt that figure. Her retirement account alone declined in value from $207,000 to $20,000 between October 2000 and September 2001. After Ms. Vinogradova became aware of the substantial losses in her accounts, she revoked the POA in writing on 9 October 2001. She then undertook to investigate what had occurred.

Appellant filed her complaint on 18 April 2003, alleging negligence and breach of fiduciary duty. The complaint described the alleged duty and breach, upon which her negligence claim was based, as follows:

30.  SUNTRUST and RIETVELD each owed a duty to YELENA to monitor her accounts, the trading activity and transfers in and out of the accounts, to exercise reasonable care to prevent loss or harm, and to advise her of any suspicious activity in these accounts.

31.  SUNTRUST and RIETVELD also each owed a duty to YELENA to monitor her accounts to ensure that Suntrust's internal policies, as well as the policies of the National Association of Securities Dealers [NASD] regarding suitability were followed.

32.  Despite having serious concerns about the conduct of BESSON, SUNTRUST and RIETVELD violated their duty of care to YELENA by failing to inform her of their concerns, failing to determine the suitability of investments made, and ultimately depriving her of the ability to preserve and protect her assets which were at risk.

On 21 July 2003, appellees filed an answer to the complaint, together with a motion to dismiss the breach of fiduciary duty

and negligence counts. They also filed a third-party complaint against Besson. Ms. Vinogradova requested a hearing on the motion to dismiss, but the circuit court, on 4 September 2003, dismissed Ms. Vinogradova's breach of fiduciary duty claim without conducting a hearing on appellees' motions.

Thereafter, on 10 March 2004, appellees moved for summary judgment in their favor on Ms. Vinogradova's negligence claim. A hearing on that motion was convened on 14 April 2004. At the conclusion of that hearing, the court ruled from the bench, granting summary judgment against Ms. Vinogradova on the negligence claim. The court issued a formal order to that effect on 24 May 2004, entering a final judgment in favor of appellees on all claims against them. Aggrieved, Ms. Vinogradova noted this appeal.

During the course of these proceedings, various evidence was placed into the record by both parties. That evidence included copies of SunTrust's internal documents and policies; the deposition testimony of T. Michael Smith, a Senior Vice President at SunTrust and Rietveld's supervisor; the affidavit and report of an expert whom Ms. Vinogradova had employed to evaluate the standard of care relevant to the securities industry; and copies of the POA and various account documents. We shall set forth that evidence in further detail below.

### SunTrust's Policies

SunTrust's "Registered Representative Compliance Guide," under a section headed "Opening and Servicing of Accounts," contained a paragraph concerning POAs, which read:

Power of Attorney

A Power of Attorney for the purpose of opening an account should only be accepted if it has been executed within the last twelve months. If the Power of Attorney is more than twelve months old *it is reasonable for us to request* a new Power of Attorney to verify that the Power of Attorney

remains in effect and that the designated Attorney–In–Fact remains unchanged.

(Emphasis added.)

Another section of the Compliance Guide provided:

Investment consultants must not ... [a]ccept an order for a securities transaction from anyone other than the entitled customer(s) on an account. A signed third party trading authorization naming a specific individual is required in order to do this *or the account must have been previously established via a Power of Attorney.*

(Emphasis added.)

### Deposition of T. Michael Smith

During his 29 January 2004 deposition, Smith testified that it was the practice of a SunTrust broker or account representative to meet with the client and talk about the significance of a power of attorney upon the opening of the account. Smith first became aware of Ms. Vinogradova's accounts when they showed up on SunTrust's "active account list," [2] which featured accounts that were engaging in heavy trading.[3] He

---

**2.** Smith could not recall when Ms. Vinogradova's accounts first appeared on the active accounts list, but stated that it could have been in late 1999 or early 2000.

**3.** The SunTrust "Policy and Procedures Manual" described "Active Account Reviews" as follows:

Every designated ... Branch Office Principal ... has a responsibility to review active accounts on an ongoing basis, which because of their activity could pose potential problems. Given the nature of our business of an initial transaction or number of initial transactions intended as a long-term investment, the number of active accounts identified should not be substantial. However, based on your review of the daily transaction blotter any account identified as having a pattern of ongoing transactions which may indicate excessive trading, is required to be reviewed[.]

Compliance will forward the Active Customer Report on a monthly basis. The designated Principals are responsible for reviewing this report and reviewing the applicable accounts.... [E]stablished accounts transacting subsequent business in speculative securities or large transactions should again be reviewed to establish the suitabili-

related that his first priority when an account appeared on this list was to talk with the SunTrust broker handling the account to ensure that the broker was not "churning" the account, *i.e.*, advocating numerous transactions in order to enhance the brokerage commissions. Smith phoned Rietveld, who informed him that there was a POA on the account and that the POA "was initiating the trades." Rietveld and Smith had an in-person meeting three days later. Rietveld informed Smith that, in accordance with broker practice, when Ms. Vinogradova opened the account, he talked to her about the nature of a POA. During their meeting, Rietveld showed Smith the POA document, and the men discussed it.

> We discussed the fact that it was a broad power of attorney. That it gave the POA a lot of discretion and power over the account.... He indicated that he had talked to Ms. Vinogradova, that he had explained to her the gravity of giving an individual this much discretion and power over her accounts. She indicated to him—that Mr. Besson was a long and trusted friend, that he knew what he was doing, that she did not want to be involved with this type of business, and that she had faith and trust in Mr. Besson to do this. And then he indicated to me that she sort of waved him away, dismissively, that she didn't want to talk about this anymore.

Smith did not consider contacting Ms. Vinogradova to inform her of the "active account" status of her accounts because "the trades were basically being initiated by her representative under a power of attorney that we consider to be valid."

Smith then told Rietveld that he would like to speak with Besson, the POA on the account. When he met with Besson, they spoke about Ms. Vinogradova's accounts, investment strategy, and who was entering the trades. Smith expressed to Besson his concern regarding the level of trading activity on the account, "but he told me, and I happened to agree, that

---

ty of the subsequent trade relative to existing account documentation on file.

the markets were very volatile at that particular time, and he was being nimble to protect the assets of the account." Smith found Besson to be knowledgeable about the workings of the markets. Smith testified that his concern about the accounts was lessened once he verified that Besson, the POA, was initiating the trades on the account.

Three or four months after Smith's meeting with Besson, Rietveld called Smith and informed him that Besson sought employment from SunTrust and wished to speak with Smith. Smith had no investment positions open, but informed Besson of some customer service representative openings in another office.

Smith had no further conversations with Rietveld regarding Ms. Vinogradova's accounts until this lawsuit was filed.

### Expert Witness Report And Affidavit

To establish that appellees had breached an industry standard of care, Ms. Vinogradova retained Thomas P. Forde as an expert and consultant to provide insight into "securities industry regulatory requirements and relevant standards of care." Forde summarized his opinions in a 24 February 2004 Expert Witness Report.[4] In that report, Forde reached the following conclusions:

● Suntrust violated an industry standard of care owed to Ms. Vinogradova by failing to properly document account information, and by permitting the transfer of account assets without having obtained appropriate authorization to do so. Moreover, Suntrust has violated its own internal policies with regard to account updates and accepting and updating a power of attorney for another to act on Ms. Vinogradova's behalf.

● Suntrust also violated an industry standard of care owed to Ms. Vinogradova by failing to document and/or retain

---

4. The circuit court assumed, for purposes of summary judgment, that Mr. Forde's affidavit and Expert Witness Report would be admissible at any future trial. We shall do the same in reviewing the grant of summary judgment.

account review documents pertaining to her accounts (and its own policy by conducting an account review with a "stale" power of attorney) and by failing to document supervisory policies with regard to customer accounts.

In an affidavit attached as an exhibit to Ms. Vinogradova's opposition to summary judgment, Forde averred that he would testify consistently with the views outlined in his report.

## DISCUSSION

### I. & II.

### Summary Judgment On Negligence

### Standard Of Review

■■ "It is essential to the entry of a summary judgment . . . that there be no genuine dispute as to any material fact and that the moving party be entitled to judgment as a matter of law." *White v. Friel*, 210 Md. 274, 285, 123 A.2d 303 (1956); *see* Md. Rule 2–501. Accordingly, the standard for appellate review is essentially whether the trial court was legally correct in granting summary judgment. *See Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 204, 680 A.2d 1067 (1996). Therefore, we "review[ ] the same material from the record and decide[ ] the same legal issues as the [circuit] court[.]" *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998). "In reviewing a disposition by summary judgment, an appellate court resolves all inferences against the party making the motion." *Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993).

### Merits

Ms. Vinogradova asserts that the circuit court erred in granting summary judgment in favor of SunTrust and Rietveld on her negligence claim. The circuit court found that there was no genuine dispute of material fact regarding whether appellees owed Ms. Vinogradova a duty to warn her of Besson's conduct. It relied heavily on the broad POA signed by Ms. Vinogradova, which gave Besson nearly unlimit-

ed authority over the funds in the SunTrust accounts. It also noted, in regard to powers of attorney, that "it would be a terribly onerous burden on the banks" to have to "second guess" the authority granted by a POA. In doing so, the court recognized a "significant public policy that allows the use of the powers of attorney."

We hold that the circuit court was legally correct in determining that there were no material facts in dispute regarding whether appellees breached a legal duty owed to Ms. Vinogradova.[5] As the circuit court recognized, there is no dispute that Ms. Vinogradova executed a broad POA that, unfortunately, gave Besson the actual authority, as her agent/attorney-in-fact, to take the actions that resulted in her substantial monetary losses. It gave Besson the power to "withdraw all funds or account balances now or hereafter outstanding" to Ms. Vinogradova's credit, even if drawn to the order of Besson, himself. It gave Besson seemingly unlimited authority to buy, sell, and transfer account assets. It granted Besson the authority to open new accounts, even in his own name. Finally, the POA, by its own language, sanctioned SunTrust's reliance on its terms, by providing: "Any person, firm, or corporation shall be fully protected in relying upon this power of attorney unless and until actual notice of its revocation ... is received." In sum, even assuming that SunTrust ordinarily would have a duty to warn Ms. Vinogradova of suspicious activity in her accounts, the POA absolved SunTrust of such duty by the broad language that gave Besson every right to take the actions he took with regard to Ms. Vinogradova's funds and by *fully protecting* SunTrust while it relied on the POA.

In her argument, Ms. Vinogradova relies on the existence of a "watch list" upon which her accounts appeared, in an effort to suggest that SunTrust had a duty to inform her of the alleged suspicious activity in her accounts. This "watch list,"

---

5. The existence of a legal duty and breach were the sole issues argued at the summary judgment hearing. Although Ms. Vinogradova's arguments on appeal address broader issues, we are limited to reviewing and deciding only arguments raised below. *See* Md. Rule 8–131(a).

however, is merely her characterization of the evidence. In fact, no SunTrust representative or document ever referred to any such "watch list." Smith testified in his deposition only about an "active accounts list" that was used mainly to ensure that SunTrust's own brokers were not "churning" customer accounts. The suggestion that this "active accounts list" was a "watch list" is mere speculation. *Nerenberg v. RICA of S. Md.*, 131 Md.App. 646, 683, 750 A.2d 655, 675, *cert. denied*, 360 Md. 275, 757 A.2d 810 (2000) ("Mere speculation falls short of showing how the evidence creates a genuine issue of material fact that would defeat summary judgment."). Ms. Vinogradova's suggestion that SunTrust was "concerned" about Besson's conduct, specifically, also lacks evidentiary support. Concern over account activity is not the same as concern over a particular individual's conduct.

In alleging that SunTrust had a duty to follow its own internal policies and industry standards of care, and that its violation of these duties caused her harm, Ms. Vinogradova relies heavily on the views outlined in Forde's expert report. But a close examination of that report reveals that Forde came to certain conclusions regarding SunTrust's policies that were contradicted by the plain language of those policies. Further, no concrete evidence was set forth as to what specific industry standards of care were violated, how they were violated, and how their violation caused Ms. Vinogradova harm. Only two NASD rules were cited by Forde in his report. Otherwise, Forde referred only to vague notions of industry practice.

■ Forde averred that, by not updating Ms. Vinogradova's "stale" POA, SunTrust violated NASD Rule 3010, which "requires broker/dealers to develop, implement and enforce their policies and procedures." The plain language of the SunTrust policy regarding POAs, however, shows that it was not a requirement, but merely *reasonable* practice, for SunTrust to request a "fresh" POA after a year. According to Forde, SunTrust also violated NASD Rule 2310, by not documenting account objectives for Ms. Vinogradova's accounts. That NASD rule requires broker/dealers to update customer ac-

count information in order to ensure that a recommended transaction is consistent with customer goals and desired risk levels. But Forde says nothing in his report about how this alleged violation of industry standards resulted in Ms. Vinogradova's loss. The vague and conclusory statements contained in Forde's report are not sufficient to meet Ms. Vinogradova's evidentiary burden on summary judgment.

Although Ms. Vinogradova asserts that there is a material dispute of fact regarding whether SunTrust's policy called for renewing "stale" powers of attorney,[6] there is nothing in the language of the policy itself, and an absence of any other evidence, to suggest that there was such a requirement. SunTrust's Compliance Manual merely stated that "it [was] *reasonable* for [SunTrust] to request a new Power of Attorney" if the original POA is over a year old. (Emphasis added.) Furthermore, there is no legal standard that invalidates a POA after a certain period of time, unless it is withdrawn in writing. There is no dispute that Ms. Vinogradova took no action to withdraw the POA until October 2001; therefore, it remained valid and fully operational until that time.[7]

Ms. Vinogradova relies on *Taylor v. Equitable Trust Co.,* 269 Md. 149, 304 A.2d 838 (1973), in support of her argument that a financial institution may be held accountable to its account holder for the acts of the account holder's third-party agent. The circumstances present in *Taylor,* however, are distinguishable from those in this case.[8] *Taylor* involved a bank's liability to its account holder for processing a single

---

6. Forde used the term "stale" in his report when describing POAs that were over 12 months old.

7. Although Ms. Vinogradova faults the circuit court for relying on public policy considerations to support its summary judgment ruling, it is clear that the General Assembly, through recognizing the validity of powers of attorney, has established the kind of public policy cited by the circuit court. *See* Md.Code (2001), § 13–601 *et seq.* of the Trusts and Estates Article.

8. The other authorities relied upon by Ms. Vinogradova also are distinguishable. For instance, *Geisey v. Holberg,* 185 Md. 642, 45 A.2d 735

$20,000 unauthorized transaction. The bank processed the transaction under the authority of a letter from an unknown third party stating that the account holder had authorized the transfer. In *Taylor*, there was testimony from the bank's operations officer that it was customarily required to insist on written instructions from the account holder before transferring funds. Under these circumstances, the Court of Appeals affirmed the circuit court's holding that, as a matter of law, the bank was liable in negligence because its conduct failed to conform to the "reasonable commercial standards" of its business in not contacting the account holder to confirm the purported agent's authority.

In contrast to *Taylor*, undisputed evidence in this case demonstrated that, for over three years, Ms. Vinogradova relied on Besson to make her investment decisions and, in essence, manage her money, by granting him broad authority as her attorney-in-fact. The POA document was signed by Ms. Vinogradova and was on file with SunTrust until she eventually revoked it after her losses occurred. There was uncontradicted evidence that Rietveld discussed the nature of the POA with Ms. Vinogradova upon her opening of the SunTrust accounts. Therefore, Ms. Vinogradova's consent to Besson's authority was communicated to SunTrust both through documentation and in person. Furthermore, unlike the situation in *Taylor*, there was no comparable evidence by SunTrust officials or others regarding what, if any, specific policy requirements were not followed by SunTrust in this case that resulted in Ms. Vinogradova's loss. The circuit court correctly held that Ms. Vinogradova had failed to present evidence sufficient to create a question of material fact that appellees were liable in negligence.

## III.

### Motion To Dismiss: Fiduciary Duty Claim

Ms. Vinogradova also challenges the circuit court's dismissal

---

(1946), upon which Ms. Vinogradova primarily relies, involved claims of fraud and conversion, neither of which is alleged in this case.

of her fiduciary duty claim without a hearing.[9] She asserts that *Kann v. Kann,* 344 Md. 689, 690 A.2d 509 (1997), a case relied on by appellees in support of their motion to dismiss, "did not eliminate entirely in Maryland an independent cause of action for breach of fiduciary duty." The Court's clarification of its *Kann* holding in *International Brotherhood of Teamsters v. Willis Corroon Corp. of Maryland,* 369 Md. 724, 802 A.2d 1050 (2002), however, refutes her interpretation of *Kann.*

■ In *Teamsters,* the plaintiff, IBT, filed a complaint alleging negligence and breach of fiduciary duty, claims identical to those filed by Ms. Vinogradova in this case. In a footnote, the Court explained:

> In *Kann* [ ], we pointed out that, although the breach of a fiduciary duty may give rise to one or more causes of action, in tort or in contract, Maryland does not recognize a separate tort action for breach of fiduciary duty. Based on the underlying averments, IBT may have been able to plead an action for breach of contract, in addition to its claim for negligence, but it chose not to do so. We shall treat the complaint as one for negligence.

369 Md. at 727 n. 1, 802 A.2d 1050.

Thus, under Maryland law, the two separately pleaded claims in Ms. Vinogradova's complaint condense to only one: the claim based on the tort of negligence.[10]

---

9. In outlining this claim, Ms. Vinogradova's complaint alleged:

    25. SUNTRUST and RIETVELD, as brokers, investment advisors and/or account representative for YELENA, each owed YELENA fiduciary duties. These duties are heightened where, as is the case here, YELENA is unsophisticated in financial matters, and is dependent upon others to translate and interpret documents and financial information, all facts that were known or should have been known to SUNTRUST and RIETVELD.

    26. SUNTRUST and RIETVELD breached their fiduciary obligations to YELENA by failing to advise her of the very suspicious activity in her accounts and failing to relay their concerns over BESSON's conduct.

10. The Court of Appeals has explained that the relationship between a bank and its depositor

█ Ms. Vinogradova asserts that the circuit court violated Rule 2–311(f) by failing to convene a hearing despite her request for a hearing on appellees' motion to dismiss her fiduciary duty claim before granting that motion. Rule 2–311(f) ("the court may not render a decision that is dispositive of a claim or defense without a hearing if one was requested"); *Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 509 A.2d 1239, *cert. denied*, 307 Md. 406, 514 A.2d 24 (1986) (ruling can be "dispositive of a claim or defense" without constituting a final judgment). While it is debatable whether the rule applies to the fiduciary duty claim in this case, since it was not an independent cause of action, even assuming that there was a violation, the alleged error was harmless in nature. Any evidence that Ms. Vinogradova could have presented at a hearing on the motion to dismiss, had it been afforded, also was relevant to the negligence claim. Ms. Vinogradova had a full and fair opportunity to present that evidence and argument at the 14 April 2004 summary judgment hearing on the negligence claim.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

is a legal one. It is broadly defined as being that of a debtor and creditor, the rights of the depositor and the liability of the bank being contractual. Unless modified by the parties the contract is that implied in a banking relationship. For a breach of this contract, an action in tort will lie.

*Taylor v. Equitable Trust*, 269 Md. 149, 155–56, 304 A.2d 838 (1973) (citations omitted).